## Commonwealth *v.* Le Grand et al.

Argued November 27, 1939.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Morton S. Freeman* and *Raymond Pace Alexander,*
for petitioners.

*Vincent A. Carroll,* Assistant District Attorney, and
*Charles F. Kelley,* District Attorney, for Commonwealth.

OPINION BY MR. JUSTICE MAXEY, December 4, 1939:
Defendants each filed in this court on November 1st
a petition for allowance of appeals *nunc pro tunc* from
the judgments of murder in the first degree and sen-
tences of death of the Court of Oyer and Terminer of
Philadelphia County.   These judgments and sentences
followed the prisoners' pleas of guilty to murder, a hear-
ing before Judges McDEVITT, MILLAR and CRUMLISH to
determine the degree of guilt, and the proper sentences.
No appeals were taken to this court but applications
for commutations of sentences to life imprisonment
were made to the Board of Pardons and the applica-
tions were refused.

On Sunday, March 26, 1939, between 2 and 3 a. m.,
defendants, who for some time had been street boot-
blacks working in the vicinity of the rear of the Wm.
H. Wanamaker clothing store in Philadelphia, removed

the lid of a manhole on the sidewalk in the rear of this store (on Clover Street). The lid was the covering of a coal chute to the store cellar. They descended "hand over hand" on a chain which anchors the manhole cover to a mooring in the coal bin. After they were inside, they replaced the cover. Defendants entered the store for the purpose of stealing clothes; they had planned to burglarize this store prior to Christmas of 1938 but did not do so until the date of the homicide. Fuller at the time was 25 years of age and Le Grand 22 years of age. They came to Philadelphia about 1933 from southern states. The watchman on the premises was John Heyworth, aged 70 years, who had been in the employ of the store for many years. Fuller was employed by this store as a porter and general worker for about two weeks in 1935 and knew this watchman.

Defendants carried no weapons. After gaining entrance, they went upstairs to the street level floor to examine some suits and while there they heard the watchman moving around in the basement. They also heard a radio playing. Fuller testified that "when we discovered that he [the watchman] was in the store, we tried to get out as we entered." They thereupon descended the back stairs to the basement and heard the watchman going up the front stairs.

A few hours after the defendants left the store the watchman was found dead and these two defendants were soon afterwards arrested. At 7 p. m. of the day of the homicide, both prisoners signed confessions and from these the facts of the killing are obtained. Fuller in his confession said, inter alia: "We were trying to get out again and he [the watchman] seen us and we rushed him and hit him over the head with a cuspidor and he fell and we didn't know he was dead but we were not taking any chances *of not getting out of here,* so we came upstairs to see if there was anybody else up there. Then we came back down again and the fellow he was laying where we left him, he wasn't dead

then so we both hit him again and we made up our minds to leave, so we went up, unlocked the back door and went out through Clover Street to 12th and Market Streets and we got a taxi-cab and went to West Philadelphia." The italicized words "of not getting out of here" were written in ink by Fuller himself after he had read the statement and was asked to correct any misstatements. These words, according to the detective's testimony, were "transplanted" for the words "of him knowing who we were." Fuller, in his confession said that Le Grand hit the watchman "three or four blows before he went down," and that he (Fuller) struck the watchman once with the mop handle. Detective William C. Schrader, who made the arrests, was asked on cross-examination: "Did they [the defendants] actually tell you they beat this man the second time they went downstairs?" He answered: "Yes, sir. That's right. Fuller . . . said he saw the watchman attempt to rise from the floor and he got this mop handle and Le Grand got the cuspidor and they both beat him on the floor."

Fuller testified that Le Grand "beat" the watchman "down" and "we both fell," and that they both went to the first floor to get out, and that they were on the first floor "not more than two or three minutes" when he discovered that he had lost his hat. Fuller, when on the witness stand, denied that he and Le Grand struck the watchman when they went downstairs the second time. He said that Le Grand suggested that they go back and look for the hat and "so, I went back down and I seen the night watchman laying there and I told Fletcher [Le Grand], 'This night watchman looks pretty bad.' The cuspidor he had hit him with, I took it and put water in it. So, there was no finger prints on it because there was a sponge inside of it. I run the cuspidor full of water and the sponge, and I scooped the water on his head. Then I poured it on his head and I set it back down, and we goes back up to the first

floor and went out." Fuller admitted in a question asked by Judge CRUMLISH that Le Grand in going to his (Fuller's) assistance, "hit the watchman several times with the cuspidor."

Le Grand, in his confession said, inter alia: "I was standing up to the manhole and he was standing back of the stairway and the man [watchman] came in right in front of me and then James [Fuller] hit him first with this mop handle, he hit him on the head. This stick was broken and then James grabbed him and I struck him with the cuspidor on the head. Then I hit him again, then James had him partly down then I hit him and he dropped. Then we went upstairs to the first floor to see if there was anyone else up there, then we didn't see no one and we went down again and we both struck him again. He was trying to get up. We hit him with a cuspidor. We went upstairs and James went in the office and got the key and we unlocked the back door" and went out. Questions addressed to him by the detective and his replies are as follows: "Q. What was the object of you and Fuller making sure that the watchman was dead? A. I wanted to keep him down so I could get out. That's what I wanted to do. . . . Q. What was the reason of you and Fuller both striking him over the head again with the cuspidor? A. Because he was getting up. Q. How many times did you strike him over the head with the cuspidor the second time? A. I hit him once and he dropped down. Q. How many times did you see Fuller strike him over the head the second time? A. I didn't see him strike him but once." The cuspidor in question was described as being heavy and "loaded in the bottom, with sand or cement."

On the stand Le Grand testified that when Fuller hit the watchman with the mop handle, it broke, and he "picked up the cuspidor and hit the watchman with it and they went down," and that he struck the watchman with it "only once." He denied that they attacked

the watchman the second time they went downstairs to the basement to look for Fuller's hat. He said he did not see what Fuller did, that they were only there about 3 or 4 minutes when Fuller found his hat and they went back up the stairs, unlocked the back door and left.

The Commonwealth was allowed to read into the record the testimony of Dr. Wadsworth at the inquest, to the effect that "the injuries to the [watchman's] head were caused by two types of weapons. There were at least six injuries. There were really more than that, but he [Dr. Wadsworth] could testify accurately to six separate injuries, and the cause of death was injuries to the head." At the argument before us, it was stated that the watchman's skull was fractured.

The Commonwealth contends (1) that this court has no power to allow an appeal nunc pro tunc in this case, and (2) that even if we had such power there is no merit in the appeal because the sentences of death were manifestly appropriate. The Act of May 11, 1927, P. L. 972, provides as follows: "Section 4. . . . No appeal shall be allowed, in any case, from a sentence or order of any court of quarter sessions or oyer and terminer, unless taken within forty-five days from the entry of the sentence or order."

Sentence having been imposed on each of these defendants on May 12, 1939, the last day on which appeal could have been taken was June 26, 1939. The petition now before us was filed four months and five days too late. It is not necessary to review those cases, mostly civil cases, in which this court has allowed appeals nunc pro tunc, after the statutory period for allowing appeals had passed. In all of those cases there were exceptional circumstances such as fraud or accident or excusable mistake which in fact and in law prevented the running of the statute limiting the time of appeal. For example, this court in *Zeigler's Petition*, 207 Pa. 131, 136, quoted with approval the following from *Hutts*

*v. Martin,* 131 Ind. 1: " 'We think it clear that an appellate court has the inherent power to relieve against accident and excusable mistake in the proper case. . . . All parties must be brought in within the time limited for appealing, unless accident, fraud or excusable mistake is affirmatively shown.' " In *Fisher v. Hestonville etc., Passenger Railway Co.,* 185 Pa. 602, 40 A. 97, this court, in an opinion by Justice MITCHELL, said: "There can be no question that the rule that fraud vitiates everything into which it enters applies to verdicts and judgments, and the equitable powers of the courts on that subject may be administered summarily upon rule. But the jurisdiction as already said is exceptional, and the facts upon which it is based should appear of record." On the record now before us this court is without power to allow these appeals nunc pro tunc.

That the application of this statutory limitation on our power works no injustice in these two cases is the unanimous opinion of this court. The evidence leads inevitably to the conclusion reached. The only claim made by defendants and their counsel is that sentence of life imprisonment instead of death should have been imposed. In *jury trials* in murder cases the *jury* has the power to say, after adjudging a defendant guilty of murder in the first degree, whether the punishment shall be death or life imprisonment, and when a plea of guilty to murder is entered, the *court* which takes the plea fixes the degree of murder and decides upon the penalty: Act of May 14, 1925, P. L. 759 (18 PS sec. 2222). Upon appeal this court will modify the extreme penalty for murder where its imposition is a manifest abuse of discretion: *Commonwealth v. Garramone,* 307 Pa. 507, 514, 161 A. 733. There was no abuse of discretion in imposing the sentences now under review. The evidence establishes that these defendants not only committed a murder in the perpetration of a burglary but also that they intended to kill their victim and that the killing was atrocious and brutal.

It is true that they carried no weapons into the store but when their victim was in their power they deliberately beat him to death with a heavy cuspidor. An intentional killing may be and often is carried out with weapons not ordinarily termed "deadly." Such weapons as revolvers are called "deadly" because their normal use is to cause death. But an ax, a baseball bat, an iron bar, or, as in this case, a heavy cuspidor, may all be so used as to cause death. When one beats a prostrate man in the head with a heavy cuspidor, it is a legitimate inference that he intends to kill that man. There was some attempt in this case to discredit the confessions of these defendants as being induced by duress but there is no proof of such duress and if there had been the court below was in the best position to pass upon the question. The confessions were competent evidence and for the purposes of these applications their admissions must be accepted.

These men were burglars. Burglary is one of the most detestable crimes known to the law. Blackstone (Book IV, sec. 223) characterizes common law burglary as "a very heinous offense" carrying "terror . . . with it; . . . it is a forcible invasion of the right of habitation; . . . an invasion which in [a state of nature] would be sure to be punished with death." By statute both in England and in this country the offense of burglary has been extended to include the wilful and malicious entering, with intent to commit a felony, of such a building as the defendants entered on the night in question. Until the middle of the 19th Century in England burglary such as the defendants were admittedly guilty of, was itself punishable by death. Every burglar is a potential assassin and when his felonious purpose encounters human opposition his *intent to steal* becomes an *intent to kill* and any weapon he finds at hand becomes a weapon of *murder*. We have held as recently as *Commonwealth v. Kelly,* 333 Pa. 280, that even an *accidental* killing in the perpetration of a rob-

bery or burglary is murder in the first degree. In the instant case, the killing was not accidental; it was intentional, for all men are presumed to intend the natural and probable consequences of their acts. The initial beating and the repeated beating these defendants administered to their helpless victim, resulting in "six separate injuries" to his head, one of which was a skull fracture, was calculated to cause death and did so. Under the facts this record presents, no one challenges the justness of the judgment of guilty of murder in the first degree, and no one can justly deny the appropriateness of the imposed penalty of death.

The petitions for allowance of appeals nunc pro tunc are dismissed.