Commonwealth *v.* Samuel Jones, Appellant.

524

Argued November 25, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Foster A. Dunlap,* with him *Leonard J. DeNote,* for appellant.

*Colbert C. McClain,* Assistant District Attorney, with him *John H. Maurer,* District Attorney for appellee.

OPINION BY MR. JUSTICE JONES, January 6, 1947:

The appellant was charged in each of two indictments with separate murders based upon a double homicide. When arraigned, he pleaded not guilty, but at trial, on advice of counsel and with permission of the court, he changed his plea to guilty. A court en banc (composed of three judges) was thereupon constituted to determine from the evidence the degree of the murder and to fix appropriate sentence accordingly: Act of June 24, 1939, P. L. 872, Sec. 701, 18 P.S. § 4701. The hearing was proceeded with on one of the indictments with the understanding among the court, the district attorney and counsel for the defendant that "The evidence taken under one bill [would] be accepted as evidence under the other". The killings were committed almost simultaneously and under exactly the same circumstances. In due course, the court adjudged the defendant guilty of murder in the first degree and imposed sentence of death thereon. The defendant appeals.

The appellant contends (1) that the Commonwealth failed to meet its burden of producing evidence capable of raising the murder above second degree and (2) that, even if the evidence justified a finding of first degree murder, the court abused its discretion in the circumstances by sentencing the defendant to death instead of to life imprisonment.

The defendant's plea of guilty was, of course, to the charge of murder generally and did not carry with it a plea of guilty of first degree murder: *Commonwealth v. Iacobino,* 319 Pa. 65, 67-68, 178 A. 823. Indeed, under our laws, an accused may not plead guilty to murder in the first degree: *Commonwealth v. Berkenbush,* 267 Pa. 455, 461, 110 A. 263. Upon the court's acceptance of the plea, the offense charged in each of the indictments (i.e., murder) forthwith became duly established as murder in the second degree. A felonious killing is inherently malicious and, without more, the crime qualifies as murder as a matter of law: see *Commonwealth v. Wucherer,* 351 Pa. 305, 310-311, 41A. 2d 574. But, so far, the offense rises no higher than murder in the second degree: *Commonwealth v. Scott,* 284 Pa. 159, 162, 130 A. 317. If the Commonwealth desires to raise the degree, the burden is upon it to prove facts supplying the essential elements of the higher degree: *Commonwealth v. Iacobino,* supra, at p. 67, citing *Commonwealth v. Bednorciki,* 264 Pa. 124, 128, 107 A. 666; *Commonwealth v. Tompkins,* 267 Pa. 541, 543, 110 A. 275; *Commonwealth v. Drum,* 58 Pa. 9, 18.

Apart from the felonious killings which are made murder in the first degree by statute because perpetrated by means of poison or by lying in wait or committed in the perpetration of or the attempt to perpetrate one of the statutorily enumerated felonies (Act of June 24, 1939, P. L. 872, Sec. 701, 18 P.S. § 4701), "the main distinction of murder in the first from that of the second degree" lies in the specific intent to take life required for the former: *Commonwealth v. Iacobino,* supra; *Com-*

*monwealth v. Robinson,* 305 Pa. 302, 308, 157 A. 689;
*Commonwealth v. Gibson,* 275 Pa. 338, 342, 119 A. 403.
Such intent supplies the qualities of willfulness, deliberation and premeditation otherwise essential, by the
statute, to murder in the first degree.

It is in respect of the alleged intent to take life that
the appellant ascribes failure to the Commonwealth's
proofs in the instant case, apparently overlooking the
fact that such intent, being subjective, is often unsusceptible of direct proof but must be found in the implications of objective manifestations, such as the character
of the weapon used by the slayer. Not infrequently,
therefore, specific intent to take life is shown by proof
of the offender's use of a deadly weapon, for while an
intention to kill may be shown by the defendant's expressed words or declarations or other conduct, such
intent may be just as effectively inferred from the deliberate use of a deadly weapon upon a vital part for
a manifest purpose: *Commonwealth v. Iacobino,* supra,
citing *Commonwealth v. Troup,* 302 Pa. 246, 253, 153
A. 337; *Commonwealth v. Green,* 294 Pa. 573, 584, 144
A. 743. As stated by our present Chief Justice in *Commonwealth v. Kelly,* 333 Pa. 280, 289, 4 A. 2d 805, "The
fatal use of a deadly weapon against a vital part of
another's body when established as a fact warrants an
inference that the act was done with a specific intent
to take life and so justifies a verdict of guilty of murder
of the first degree". Cf. also *Commonwealth v. Robinson*
and *Commonwealth v. Troup,* supra. Nor do deadly
weapons consist exclusively of peculiarly lethal instruments or devices. Indeed, "An intentional killing may
be and often is carried out with weapons not ordinarily
termed 'deadly'. Such weapons as revolvers are called
'deadly' because their normal use is to cause death. But
an ax, a baseball bat, *an iron bar* . . . may all be so
used as to cause death" (emphasis supplied) : *Commonwealth v. LeGrand,* 336 Pa. 511, 518, 9 A. 2d 896, quoted
with approval in *Commonwealth v. Pepperman,* 353 Pa.

373, 376, 45 A. 2d 35. The manner of *use* of such, or similar, weapons is no less capable, legally, of affording an inference of the hostile wielder's intent to kill: see *Commonwealth v. Kluska*, 333 Pa. 65, 3 A. 2d 398, and cases there aptly reviewed at p. 70. With these legal principles in mind, we turn to the evidence in the instant case.

Between 7:15 and 7:30 o'clock in the evening of January 26, 1946, the bodies of a man and a woman were found lying in an unconscious condition on opposite sides of Haverford Avenue, Philadelphia, in the 5800 block. Each was suffering from a battered head of recent infliction, specifically, a fractured skull and brain injury in the case of the woman on the indictment for whose murder the hearing proceeded. The testimony with respect to the character and extent of the man's injuries was lay and not professional. Apparently each of them had been struck a severe head blow with a heavy, rigid instrument. Both victims were removed to a hospital where the woman died January 31st following and the man about ten days later. The woman was Mary Andrews, aged forty-one, who resided at 5825 Haverford Avenue. Her body was lying in front of the premises at 5824-26 Haverford Avenue across the street from her home. The man was Leon Hall, aged "around" forty-five, whose body was found on the sidewalk in front of 5825 Haverford Avenue (the Andrews residence).

For some years prior to the time above-mentioned, Samuel Jones, the defendant, aged forty-one, who resided at 5836 Haverford Avenue, and Mary Andrews had been acquainted. In fact, they had lived together meretriciously for more than a year, but that relationship had been terminated about a year before the day above referred to. At the later time, Hall was "keeping company" with Mary Andrews as, known to the defendant, he had been so doing for several months prior thereto.

Most of the afternoon of the day in question, the defendant spent with a friend, one Earl Roberts, drinking gin at the home of other friends (McNeills) at 418 North Hobart Street, not far from the Haverford Avenue addresses above given. Toward the close of the afternoon, Roberts, having become drunk, was taken from the McNeill house by the defendant who put Roberts to bed in the Jones home at 5836 Haverford Avenue. It then being late afternoon, the defendant went to a taproom nearby at 59th and Callowhill Streets, and, while there, met Mary Andrews. The defendant expressed a desire to talk with her about a possible resumption of their former relationship, but she kept inquiring whether the defendant had seen "my baby", meaning Hall, and refused to go outside the taproom with Jones. Just then Hall appeared, and the three of them left the taproom together, walking to Mary Andrews' home, a short distance away. There, an altercation ensued on the porch during which the defendant hit Hall with his fist, knocking him to the pavement below. At that time the defendant was not armed with a weapon or other artificial instrument capable of causing death. The defendant at once went diagonally across the street to his home. He testified at the hearing in the court below that he must have gone "haywire" at that time and claimed not to have remembered anything from then on for several days. He laid his asserted lack of memory to the quantity of intoxicants he said he had consumed that afternoon and evening.

Fifteen or twenty minutes after the bodies had been found at the time and place above stated, the police apprehended the defendant, as a suspect, at 59th and Callowhill Streets, a short distance from the scene of the crimes. From the time of the assaults, he had been back to his home and thence to the McNeills on North Hobart Street where he told Mrs. McNeill that he had hit Mary Andrews and Hall and had left them lying on Haverford Avenue. Julius McNeill, the husband, over-

hearing that, ordered Jones from the house. The police followed closely upon him, first to his home and then on to the McNeills where they were told what Jones had related before departing shortly before. The police proceeded to 59th and Callowhill Streets where they picked up the defendant as already stated.

Upon his apprehension, Jones denied his identity, but that was soon established by the McNeills and forthwith admitted by the defendant. When he was asked by the police concerning the weapon with which the serious injuries to Mary Andrews and Hall had been inflicted, he let the officers rest under a wrong surmise as to the character of the instrument and affirmatively gave them false information as to the disposition he had made of the weapon. However, independent search by the police soon discovered an iron bar at the foot of the cellar stairs in the defendant's home. On the bar there was clotted blood and matted hair, the hair upon analysis matching the hair of Mary Andrews and Hall. The bar resembled a poker. It was approximately three feet in length, one-half inch in diameter and weighed about eight pounds. Later, the same evening, the defendant, when confronted with the iron bar, admitted his guilt and signed a written confession which he did not impeach at trial except for the implication of his assertion that he did not remember anything after going to his home following the altercation on the porch of Mary Andrews' residence. The defendant admitted at trial that the iron bar belonged to him and that it was the weapon which he had used to inflict the mortal wounds on his victims.

We think it is quite apparent that the finding of the learned court below that the defendant in his assault upon Mary Andrews and Hall entertained a specific intent to take life is fully warranted by the evidence. The lethal-potentiality of the heavy weapon used, when wielded with human force against a vital part of the victims, was alone sufficient to support the finding of

homicidal intent which forthwith legally justified the elevation of the admitted murders to first degree: cf. *Commonwealth v. Kelly,* supra. There is also in the case the further fact, corroborative of the intent essential to murder in the first degree, which is to be found in the "time elapsed" while the defendant went to his home to procure the murderous weapon and returned with it to the locale of the Andrews house as well as in the defendant's physically evident pursuit of one or the other of his victims across the width of the avenue. Whether the time so consumed was sufficient for the defendant to form a specific intent to take life and whether he did so were questions of fact (cf. *Commonwealth v. Drum,* supra, at p. 16) for the hearing judges to decide in the circumstances. Furthermore, a proven motive confirmed the existence of the crucial intent. Not only was the motive generally inferable from evidence in the case, but the defendant, himself, on the witness stand admitted his jealousy of Mary Andrews and of her affection for Hall which she openly revealed to the defendant. As is widely recognized, murder may be committed without a motive, either actual or apparent, but an established motive may go to prove the related intent (cf. *People v. Dinser,* 192 N.Y. 80, 84 N.E. 577, 578) just as an absence of motive may be used to deny the existence of intent: see *Commonwealth v. Buccieri,* 153 Pa. 535, 544, 26 A. 228; *McClain v. Commonwealth,* 110 Pa. 263, 269, 1 A. 45; *Commonwealth v. Ferrigan,* 44 Pa. 386, 388.

Counsel for appellant concede that the intent requisite to murder in the first degree may, in appropriate circumstances, be inferred, but argue that ". . . it requires more than a single blow to support [the inference]" and cite *Commonwealth v. Weston,* 297 Pa. 382, 388, 147 A. 79, and *Commonwealth v. Caliendo,* 279 Pa. 293, 296, 123 A. 797, as authority for the contention. The statement in the *Weston* case that the jury might properly consider the blows struck, subsequent to the fatal

one, "as indicating defendant's intent" was certainly not meant to imply that, where one vitally placed blow with a "deadly weapon" suffices for the homicidal purpose, thus manifested, and, consequently, is all the force that is exerted, it is insufficient to prove intent. In the same connection, while the defendant's specific intent to take life in the *Caliendo* case, supra, was "convincingly demonstrated by the number of shots fired" (in excess of the ones producing death), such intent may, no less, be inferred from the firing of a single shot if well aimed at a vital spot: see *Commonwealth v. Green,* supra, at p. 585, where the same learned justice who wrote the opinion in the *Caliendo* case said for this court that "We can imagine no [one] *act more strongly indicative of an intent to kill* than the deliberate shooting of *a* bullet into another's head" (emphasis supplied).

Appellant's counsel further urges upon us that the defendant was so intoxicated in the late afternoon and evening of the day of the killings as to be incapable of formulating or entertaining an intent to take life and that the court below, in determining the degree of the murder, failed to give that fact due effect. Intoxication, when sufficiently complete to overpower the intellect and will, may prevent murder of the second degree from being raised to first degree simply because of the impossibility in the circumstances of fastening a homicidal intent upon the killer. But, in *Commonwealth v. Detweiler,* 229 Pa. 304, 308, 78 A. 271, it was said that "The law as settled in our state is, 'The mere intoxication of the defendant will not excuse or palliate his offense unless he was in such a state of intoxication as to be incapable of conceiving any intent. If he was, his grade of offense is reduced to murder in the second degree:' Com. v. Cleary, 135 Pa. 64." [1] When a defend-

---

[1] The term "reduced" was obviously misspoken in the context. The absence of a specific intent to take life does not *reduce* the crime grade of a felonious killing from first degree to second degree murder.

ant seeks to extenuate his offense on the ground of intoxication, the burden is upon him to prove by a fair preponderance of the evidence that his alleged sodden condition was such as to prevent him from forming any intent: cf. *Commonwealth v. Iacobino,* supra, at p. 68. See also *Commonwealth v. Prescott,* 284 Pa. 255, 257-8, 131 A. 184; *Commonwealth v. Walker,* 283 Pa. 468, 475, 129 A. 453; *Commonwealth v. Troy,* 274 Pa. 265, 271, 118 A..252. At most, therefore, the fact of intoxication, if introduced by a defendant at the trial of an indictment for murder, becomes an issue for the triers of the facts to determine. And, their findings in such regard, as in the case of all other relevant and material facts, are to be accorded both the competency and weight ordinarily ascribable to a jury's verdict.

It is plainly evident from the finding of first degree murder in the instant case that the trial judges concluded that the defendant's state of intoxication was not such as to prevent him from forming an intent to take life. That conclusion was fully warranted. As was said in *Commonwealth v. McGowan,* 189 Pa. 641, 647, 42 A. 365, in quoting from 1 McClain on Criminal Law, section 162, ". . . even though there is intoxication there may be deliberation and premeditation, and if the evidence shows these elements of murder in the first degree to have been present, the intoxication will not reduce [see footnote 1 supra] the murder to the second degree". See also *Commonwealth v.. Detweiler,* supra, at p. 309. A finding by the court below that Jones was not intoxicated could not reasonably be attacked, as error, on the basis of the evidence. It was only the defendant and his mother who testified to his being "drunk", while, on the contrary, both of the McNeills,

---

Rather, it is the Commonwealth's failure to prove the intent requisite to murder in the first degree that prevents the crime from being *raised* from second degree to first degree murder. This distinction is not a mere quibble. It recognition is essential to a proper regard for the burden resting upon the Commonwealth.

who saw the defendant shortly before as well as immediately after the killings, testified that he was sober, as did also several of the police officers. In fact, the defendant's brother, who was a witness for the defense and who saw the defendant when he brought Roberts to the Jones house late in the afternoon in question, admitted in cross-examination that, although the defendant had been drinking, he "was not drunk". Nor did Roberts' inebrious condition have the slightest evidentiary bearing on the question of the defendant's mental and physical state in relation to sobriety: see *Commonwealth v. Cleary*, 135 Pa. 64, 86, 19 A. 1017.

Our examination of the record in this case in the performance of our statutory duty in the premises (Act of February 15, 1870, P. L. 15, Sec. 2, 19 P.S. § 1187) clearly reveals that there is ample believable evidence to support the trial court's finding that the defendant assaulted his victims with a deadly weapon for the manifest purpose of taking life. The admitted murders were, therefore, murders in the first degree as a legal consequence: *Commonwealth v. Kelly*, supra. All essential ingredients of the indicted crime are present and no valid legal reason exists for our interfering with the conformable judgment entered by the court below.

With the appellant's guilt of murder in the first degree thus established, we come to the sentence imposed by the court below. Not unnaturally, the defendant thinks that, even though the offenses were found to be murder in the first degree, the penalty should have been life imprisonment. It is true that the case has elements which go to indicate that the murders were "committed under the impulse of some frenzy or strong passion" aroused by "a social entanglement",—a situation which may logically incline a jury or a court (upon a plea of guilty) to impose the less severe of the alternate penalties for murder in the first degree: see *Commonwealth v. Ritter*, 13 D. & C. 285, 292-293. Then to it must be recognized that such emotional disturbances can

hardly be any different in their mental or physical effects where the "social entanglement", from which they emanate, arose, as is so frequently the case, out of a meretricious relationship. But, before we, on appeal, may substitute life imprisonment for the extreme penalty, the imposition of the death sentence must appear to be "a manifest abuse of discretion": see *Commonwealth v. LeGrand,* supra, at p. 517, quoting from *Commonwealth v. Garramone,* 307 Pa. 507, 514, 161 A. 733. And, no such abuse has been either shown or suggested on the present appeal. It does not lie within our province, as an appellate court, to attempt a catalogue of relative grades or shades of brutality, viciousness or depravity as a fixed and immutable standard for juries or trial courts in appraising death in one instance and life imprisonment in the other as the appropriate penalty for first degree murder.

Judgment and sentence affirmed.