UNITED STATES of America ex rel.
George Lee RIVERS, Appellant,

v.

David N. MYERS, Superintendent, State
Correctional Institution at Grater-
ford, Pennsylvania.

UNITED STATES of America ex rel.
George Lee RIVERS

v.

David N. MYERS, Superintendent, State
Correctional Institution at Graterford,
Pennsylvania, Appellant.

Nos. 15376, 15377.

United States Court of Appeals
Third Circuit.

Argued Feb. 6, 1967.

Decided Oct. 20, 1967.

Harry Shapiro, Herman I. Pollock, Defender Assn. of Phila., Philadelphia, Pa. (Vincent J. Ziccardi, Defender Assn. of Philadelphia, Philadelphia, Pa., on the brief) for George Lee Rivers.

Joseph M. Smith, Asst. Dist. Atty., Chief, Litigation Div., Philadelphia, Pa., (Gillian R. Gilhool, Asst. Dist. Atty., Alan J. Davis, Asst. Dist. Atty., Chief, Appeals Division, Arlen Specter, Dist. Atty., Philadelphia, Pa. on the brief) for David N. Myers.

Before HASTIE, FORMAN, and SMITH, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

These cases involve appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting in part the petition of George Lee Rivers for a writ of habeas corpus. In No. 15377, the Commonwealth of Pennsylvania appeals from that part of the order implementing the District Court's holding that two confessions given by the petitioner were unconstitutionally obtained. In No. 15376, the relator appeals from that part of the order based on the District Court's finding that the relator was not incompetent to enter a guilty plea or to understand and assist in the sentencing proceedings against him in 1957. The background of this case, including extensive prior litigation, is detailed in the District Court's opinion, reported at 240 F.Supp. 39 (1965).

The offense for which the relator is presently incarcerated and under sentence of death is the fatal shooting of the proprietor of a Philadelphia pharmacy during the course of a robbery on March 26, 1957. Rivers pleaded guilty to a charge of murder, and his two confessions, which portrayed him as the lookout man for two accomplices, Cater and Williams, were used in a proceeding to determine the degree of murder and the penalty.

The lines of analysis and characterization of events in the present case are shaped by a crucial constant factor—the psychological makeup cf the relator. At the time of the commission of the crime and the confession, Rivers had just reached the chronological age of eighteen. During his twelve years in school, the highest level he attained was the second term of the second grade. Thereafter he was assigned to a special class for orthogenic backward pupils where he remained until 1955 when he was placed in the Boone Disciplinary School. He left the school system in March 1956, about a year before the crime, after having passed the age of compulsory attendance. Intelligence tests administered showed an I.Q. of 69 recorded in 1947; 75 in 1955; and in 1959, two years after the crime, 77 (verbal 69, 91 performance), though one psychiatrist testified that his I.Q. could have been lower than 77 in 1957.

Rivers has been examined by at least four psychiatrically trained physicians, whose findings are in accord in significant respects. As a result of an examination made on June 5, 1957, Dr. Andrew Mallin reported in part as follows:

"From the psychiatric standpoint he is emotionally dull, blunted, and very slow in speech. * * * Delusions and hallucinations are present. * * * He has had visions of his dead grandfather since about the age of 13. * * * Orientation is good, but memory is defective; he cannot give the date of the homicide and cannot give other details of his life. Intelligence and reasoning are impaired. * * * Judgment and insight are impaired.

"Diagnosis: Mental deficiency with psychosis, moderately severe, chronic.

"Conclusions and recommendations: This man is psychotic and moderately mentally defective, probably a low grade moron. He is very susceptible and easily led by others."

Dr. John G. Torney, who examined the relator in September 1959 at the Eastern State Penitentiary, described Rivers's condition "at the present time" as sociopathic rather than psychotic, and found no mnemonic defects. He agreed, however, that petitioner's "reflective abilities are at a defective level," and stated that psychological testing indicated "a highly impulsive individual whose behavior is governed chiefly by immediate need and desire to the exclusion of rational consideration," and that he could be "easily led."

Dr. Silas L. Warner, who also examined the relator in 1959, testified that he had "a very limited capacity to think. * * * He is limited in considering all the factors that go into certain acts. He is not capable of bringing together all the necessary knowledge to make a proper decision," and that he was of a class of persons "highly suggestible and leadable."

Dr. Jonas B. Robitscher, who saw the relator approximately once a month during an 18 month period in 1961 through 1963 as a consulting psychiatrist at Graterford Prison described his observation of Rivers as evincing a course of

"obsessive thinking, rumination, great depression, great anxiety * * * nausea and vomiting, even when the prisoner was on tranquillizers * * * tremor * * * paranoid trends, and later more serious symptoms appeared, hysterical laughter, jaw cracking, and * * * inappropriate emotional response, all of which indicated to me that this was a person with extremely grave psychological problems."

Dr. Robitscher further testified that he believed that the relator had been incompetent to aid counsel and enter a guilty plea in 1957.

—I—

The opinion of the District Court was written at a time when the retroactivity and implications of the decision in Escobedo v. State of Illinois [1] were in doubt. The District Judge held that if *Escobedo* were directly applicable, neither confession would be admissible because of a denial of the Sixth Amendment right to counsel, but that if he were incorrect in assuming its applicability, the second of two confessions given would nevertheless be inadmissible "under the facts of this case" without specifying the grounds for this conclusion. The Supreme Court's subsequent decision in Johnson v. State of New Jersey [2] precludes retroactive application of the *Escobedo* rule. We believe, however, in accord with the District Court's conclusion that the use of the second confession was violative of the Fifth Amendment.

Rivers was arrested at about 5.00 p. m. on March 27, 1957, the day following the

1. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

2. 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

homicide, and was taken to Homicide Division Headquarters at City Hall in Philadelphia, arriving at approximately 6:00 p. m. Questioning began a few minutes thereafter and continued until approximately 9:30 p. m., when the police began taking a formal written statement from the relator which was completed in about three hours.[3] No transcript of the questioning prior to 9:30 p. m. appears to have been made, and the formal written statement consists of questions put by the interrogating detective and the answers of the relator thereto. In the early part of the statement, the interrogator is recorded as having warned that anything said by the relator "will be used for or against you" at the time of trial. There is no evidence that the petitioner had been advised of his constitutional rights to remain silent or to his right to counsel.

After the completion of the statement, the relator was processed and "slated" by the police and was placed in the "central cell room" at about 1:20 a. m. of March 28, 1957. At about 9:30 a. m. of that day Rivers, unrepresented by counsel, was taken from his cell for a preliminary hearing before a magistrate in City Hall. The Commonwealth, however, requested that the hearing be continued, and accordingly Rivers was held for a further hearing a week later on April 4, 1957. It does not appear that during the hearing Rivers was informed by the magistrate of his rights. After the hearing, instead of being sent to the County Prison, Rivers was returned to the custody of the police.[4]

Rivers was interrogated upon his return, and at about 2:10 p. m. the police began the elicitation of a second written statement, which was completed at about 4:55 p. m. The reason given by the police for seeking a second confession was that they were not satisfied that the account of the division of the proceeds of the robbery in the first statement was accurate, since it had stated that the money was divided on the street rather than inside a particular house, which latter situation might have involved criminal liability on the part of individuals in addition to the charged defendants. After having signed the second statement, Rivers was placed in a detention cell in Homicide Headquarters, and it was not until 7:09 p. m. that evening that he was taken to the County Prison. Detectives testified that Rivers neither had nor asked to see counsel and that he would have been allowed to make a phone call but did not do so. The only person to see Rivers during his detention was his mother for a period of about five minutes. She testified that she first saw him in the courtroom at the time he was first taken for a preliminary hearing, and talked with him "in the detective's room" thereafter in the presence of the detectives, and that she exchanged "just a few words" with her son.

■■ What appears to us from this record is that in obtaining Rivers's *second* confession, the police took unwarranted advantage of a mentally ill and mentally defective youth, whose intellectual deficiencies should have or did become apparent to them at least as early as the first period of questioning. The detective who interrogated Rivers testified at the hearing in the District Court that by the time he had finished taking Rivers's first statement he was aware that Rivers was, understatedly, "not too intelligent," and at a previous hearing the same detective testified that he had noticed Rivers's difficulty in understanding the import of "words of more than one or two syllables." There is also the fact that at no time was Rivers informed of his absolute right to silence or his right to counsel,[5] although a person of his de-

---

3. Rivers's assertions that he was intermittently beaten by the detectives was contradicted by the testimony of the detectives and was found not credible by the District Court.

4. See footnote 5, infra.

5. While the rules of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) do not govern

ficiencies would be most needful of this information. There is the further fact that even though Rivers was taken before a magistrate before the second confession, the Commonwealth did not seek to charge him, but rather postponed the hearing, whereupon Rivers was remitted not to the County Prison but to the custody of the detectives. These events occurred at a time when the police had enough evidence—in fact a confession—to insure that cause to hold him could be established, and when there was obviously no impossibility or impracticability to hinder access to the magisterial proceeding.[6]

Moreover, the detectives, by their own admission, were not satisfied with Rivers's confession and wished to develop the case further, and clearly proceeded to do so by taking advantage of Rivers's return to their custody to elicit another confession. And finally we are troubled by doubts concerning the independence of Rivers's confession in such gossamer areas as initiative, premeditation, and intent in the light of the following circumstances appearing from the record: A recount of the events of the robbery had been given by at least one of Rivers's co-defendants prior to or during the period of Rivers's interrogation, at a time when the contents thereof could have been fed in question form to Rivers. Moreover, it is apparent from the detectives' own testimony that they were using a method, entirely unobjectionable in itself, of comparing the versions of each of the three suspects toward the development of a consistent account of the robbery. Superimposing upon this the uncontradicted opinions of four psychiatrically trained doctors that Rivers was an abnormally suggestible person, and the opinion of Dr. Mallin which was made most proximately to the foregoing events that petitioner had mnemonic defects and delusional and hallucinatory tendencies, and the fact that no transcript of the informal periods of questioning appears, the record suggests grave difficulties in separating Rivers's independently held memory of events preceding the robbery from the interrogative input of the detectives.

this case because not retroactive, the Supreme Court has stated:

"The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by Miranda, is a *significant factor* in considering the voluntariness of statements later made." Davis v. State of North Carolina, 384 U.S. 737, 741, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966). (Emphasis supplied.)

6. See Opinion of Attorney General of Pennsylvania, "Powers and Duties of Police Officers Regarding Arrests," 14 Pa.Dist. & Co.R.2d 271, 277–279 (1958).

"After the arrest has been effected, the officer is under a duty to proceed without unnecessary delay to take his prisoner before a committing magistrate where, if the arrest was made without a warrant, he must file a sworn information. Thereupon a preliminary hearing may be held at once by the magistrate or a date set for one in the future. At that juncture, however, the disposiiton of the prisoner becomes the responsibility of the magistrate, the responsibility of the arresting officer, as far as his personal custody is concerned, then ceases."

\* \* \* \* \*

"Also it should be noted that the act does not discriminate between cases of arrests with a warrant and those without one; in the former case the command of the warrant is plain, that the prisoner be *brought before a magistrate*, not locked up somewhere for as long as 48 hours."

\* \* \* \* \*

"[Y]ou are accordingly advised that the Act of April 23, 1909, P.L. 141, 19 PS §§ 4, 5 does not authorize the incarceration of a person suspected of a crime for a period of up to 48 hours pending investigation to determine whether a charge should be lodged against the suspect, but merely permits the temporary lodging for a period of up to but not in excess of 48 hours of a person under arrest because of the impossibility or impracticality due to an emergency situation beyond the control of the arresting officer, of proceeding without unnecessary delay to take the prisoner before a committing magistrate." (Emphasis in original).

■ These doubts engendered by the peculiar psychic deficiencies of Rivers in the circumstances are perhaps equally applicable to the first confession. But we find that the elicitation of that confession was outside Fifth Amendment prohibitions for the following reasons: Doubts about the accuracy of a confession's contents have primary relevance to weight and credibility rather than admissibility. Constitutional strictures forbidding the admission of confessions are designed in part to obviate questions of credibility induced by the interrogating process and thus come into operation only when it appears that enforcement authorities have engaged in some unwarranted acts or have omitted vitally necessary procedures with respect to a suspect in circumstances demanding some other course of action. On the record in this case it is clear that a reasonable awareness of Rivers's intellectual deficiencies arose only after the detectives had already secured all the substantive incriminating information which constituted the first confession. Many of the factors we have noted above in connection with the second confession, including the duration of confinement with minimal outside contact and additional opportunities for giving a full constitutional warning, followed and thus are not applicable to the first confession.

—II—

■ The District Court also found that the relator failed to sustain his burden of showing that he was incompetent to enter a plea of guilty or to aid in his defense at the sentencing proceeding in 1957. We agree, and will not detail the basis for this conclusion because that task has been meticulously executed in the opinion of the District Court, with which we are in accord. The sole non-cavilling challenge to the District Court's analysis is addressed to its finding that a portion of Dr. Mallin's report in 1957 concluded that the relator was "competent to confer with his counsel and stand trial in June 1957." The passage to which this finding was apposed reads:

"He was fully aware of what he was doing in the holdup, and was aware that Williams was carrying a gun. He knew right from wrong, knew the nature and quality of the act, and his reasoning capacity was impaired by the use of alcohol and marijuana. * * * The nature of his mental deficiency and mental illness should be considered in his sentence. Treatment of the psychosis is indicated, but the mental deficiency cannot be corrected."

We agree with the relator that it would be more accurate to say that Dr. Mallin simply did not address himself to the question of Rivers's competence to effectively communicate with his counsel or to understand the significance of his guilty plea, in contradistinction to the question of exculpatory legal insanity. This view does not, however endanger the District Court's final conclusion. The remainder of the evidence—including in part statements made by counsel in 1957 of their belief in Rivers's competency and comprehension; the repeated and arduous efforts by able counsel to explain to Rivers the consequence of the plea and the alternatives thereto; and the appreciation in 1957 of counsel and the relator of the great strength of the evidence against him—amply supports a finding of a competent participation. Conversely, the evidence most favorable to the relator, including the testimony of one psychiatrist in 1964 that the relator was incompetent in 1957, and statements by relator's trial counsel recanting to some extent the firmness of his belief in 1957 that the relator was competent—were subject to serious and detracting challenge, impelled in part by the passage of many years between the events involved and the opinions expressed thereon.

—III—

In accordance with the District Court's holding that both confessions must be excluded, it ordered that both the finding of first degree murder and the relator's death sentence be vacated. However, the effect of our holding that the first confession was validly obtained, that the second was not, and that the guilty plea was competently entered, is that a new hearing must be held to determine rela-

tor's sentence, but that the conviction of murder in the first degree must stand.

 Under Pennsylvania law, if a defendant pleads guilty to murder, the plea is to murder generally and not to either first or second degree murder. The degree is to be determined by the court in a proceeding wherein the Commonwealth has the burden of showing murder in the first degree.[7] In the present case the petitioner's culpability for a murderous homicide was established by his guilty plea, and the petitioner's first confession showed that the homicide occurred during and as a result of a felony in which the petitioner was an active, willing participant. Under these circumstances, Pennsylvania law requires a finding of felony murder,[8] which is murder in the first degree, and to suggest that the three-judge sentencing court could have found otherwise would be to impute caprice to their judgment.

A different conclusion is demanded in regard to the petitioner's sentence, for the criteria governing the imposition of a life sentence or of death are unformulated and uncatalogued, and the choice is "left wholly to the conscience and unfettered judgment of the tribunal charged."[9] Under present circumstances, the relator must be resentenced. We do not know what part the second confession played in the imposition of the death sentence since there are several notable disparities between the two confessions as follows: Aside from different versions of the division of the proceeds of the robbery, the first confession conveys the impression that the relator conceived of or agreed to the robbery in a very brief period prior thereto, and does not show that he knew that either of his confederates carried a gun. On the other hand, the second confession provides the additional information that he and his codefendant, Cater, changed to sneakers and working shoes sometime before the robbery for the purpose of being able to run faster, and that Rivers saw Cater take a pistol from his dresser drawer. There is also an explicit statement of premeditation in the second confession: "I had it in mind to pull a holdup," which is lacking in the first, and this statement was quoted verbatim in the opinion of the sentencing court. Finally, the second confession, but not the first, portrays the relator as rather coldheartedly and disassociatively spending a night of revelry after the robbery.

We therefore affirm the order of the District Court granting in part the relator's petition for a writ of habeas corpus, with the modification that a judicial proceeding need be held only for redetermination of sentence rather than the degree of murder, and staying the issuance of the writ for a period of 90 days to permit the Commonwealth of Pennsylvania an opportunity to initiate an appropriate sentencing proceeding.

---

7. Commonwealth v. Ahearn, 421 Pa. 311, 316, 218 A.2d 561 (1966); Commonwealth v. Markle, 394 Pa. 34, 37, 145 A.2d 544 (1958); Commonwealth v. Jones, 355 Pa. 522, 525, 50 A.2d 317 (1947); see 18 Pa.Stat.Ann. 4701, Act of June 24, 1939, P.L. 872, § 701.

8. See Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472 (1958).

9. Commonwealth v. Cater, 396 Pa. 172, 178, 152 A.2d 259, 263 (1959).