UNITED STATES ex rel. ELLIOTT

v.

HENDRICKS, Deputy Commissioner, Department of Public Welfare.

No. 11141.

United States Court of Appeals Third Circuit.

Argued December 22, 1953.

Decided June 2, 1954.

William R. Pomerantz, Barnie F. Winkelman, Philadelphia, Pa., for appellant.

Randolph C. Ryder, Deputy Atty. Gen. of Pennsylvania (Frank F. Truscott, Atty. Gen. of Pennsylvania and Francis J. Gafford, Deputy Atty. Gen. of Pennsylvania, on the brief), in behalf of the Commonwealth of Pennsylvania.

Richardson Dilworth, Dist. Atty., Michael von Moschzisker, First Asst. Dist. Atty., Samuel Dash, Asst. Dist. Atty., Philadelphia, Pa., appeared to support the jurisdiction of the Court.

Warren Olney III, Asst. Atty. Gen., Robert S. Erdahl and Richard J. Blanchard, Attys. U. S. Department of Justice, on brief, for the United States.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from the judgment of the district court dismissing the relator's petition for habeas corpus.

The relator, Elliott, was tried in the Court of Oyer and Terminer, Philadelphia County, Pennsylvania, on the charge of murder. He was represented by counsel throughout the trial and throughout the subsequent proceedings. Indeed, counsel have been very vigilant in looking after his interests. After several days of trial, he changed his plea from not guilty to guilty. Pursuant to Pennsylvania law, three judges determined that the murder was murder of the first degree and then sat to consider the question whether the penalty to be suffered by the prisoner should be life imprisonment or death. As authorized

by a Pennsylvania statute, Act of May 2, 1933, P.L. 224, the court called upon a psychiatrist to "guide" it [1] with regard to the mental condition of the prisoner. The court appointed Dr. William Drayton, Jr. Dr. Drayton had been chief of the Philadelphia General Hospital psychiatric department since 1926, neuropsychiatrist in the Philadelphia Municipal Court since 1922, and associate professor of neuropsychiatry in the Graduate School of Medicine of the University of Pennsylvania.

To Dr. Drayton was turned over a file containing much of the prisoner's medical, penal and psychiatric history, which the court requested him to interpret. One member of the court stated to defendant's counsel:

"You are putting something [hospital records] on the record that we know we cannot read or interpret * * * I would only agree to the appointment of a psychiatrist by the Court and he professionally would interpret that record and that would be the basis of the history of this man; further that he would come into Court and translate that record into understanding terms."

Dr. Drayton's report, dated July 6, 1950, was unfavorable to the prisoner. He advised the court that Elliott

"is probably no higher mentally than the middle grade moron scale * * *. In addition to being mentally defective in the moron level, it is evident that this man is a fabricator of the first water * * *. He shows no evidence of being mentally ill."

The court sentenced Elliott to death. He took an appeal and the judgment was affirmed, Commonwealth v. Elliott, 1952, 371 Pa. 70, 89 A.2d 782. Subsequently, his petition to the Court of Common Pleas for a writ of habeas corpus was denied and again he appealed to the Supreme Court of Pennsylvania. Again judgment was affirmed, Commonwealth ex rel. Elliott v. Baldi, 373 Pa. 489, 96 A.2d 122, certiorari denied, 1953, 345 U.S. 976, 73 S.Ct. 1125, 97 L.Ed. 1391. He then, through his lawyers, applied to the federal district court for a writ of habeas corpus, which was denied in a thoughtfully considered opinion by Chief Judge Kirkpatrick.

Preliminarily, it is asserted that a writ of coram nobis is still available to relator in the Pennsylvania courts and that, thus, he has not exhausted his state remedies. However, we think that, although only the writ of habeas corpus was before it, the Supreme Court of Pennsylvania in effect disposed of relator's claims to both writs in its second opinion. This is not completely clear. The court speaks of possible remedies, in the situation to which it refers, as being a writ of habeas corpus or a writ of coram nobis, 373 Pa. at page 493, 96 A.2d at page 124. The scope of coram nobis is dealt with by footnote; habeas corpus is discussed more fully. But at the end of the opinion the court, in language quoted later herein, makes an all-inclusive statement to dispose of Elliott's case.

There are, then, two problems before us on this appeal.

## I.

■ One has to do with the constitutionality of this whole proceeding in federal court. The State of Pennsylvania, in a brief joined in by the Attorneys General of forty other states, contends that this whole process of review by inferior federal courts is unconstitutional and, of course, therefore void. This Court is unanimous in rejecting that argument.

The procedure followed in the present case, and others involving habeas corpus applications by persons held in custody after conviction in state courts, is set out in the federal statutes. The Habeas Corpus Act (28 U.S.C. § 2241 and following) gives authority for issuance of a writ when a prisoner "is in custody in violation of the Constitution or laws

1. This is the statutory language.

or treaties of the United States * *." Present section 2254 provides that an applicant must have first exhausted his state remedies. The provision allowing federal courts to extend the protection of habeas corpus to those in state custody came into the law in 1867.[2] "Prior to the Civil War, *habeas corpus* was available in the United States courts, barring limited exceptions, only for those in federal custody."[3] The constitutionality of the wider coverage was very clearly declared by Mr. Justice Harlan, speaking for the Court in Ex parte Royall, 1886, 117 U.S. 241, 249, 6 S.Ct. 734, 739, 29 L.Ed. 868:

"But as the judicial power of the nation extends to all cases arising under the Constitution * * * no doubt can exist as to the power of Congress thus to enlarge the jurisdiction of the courts of the Union * * *. That the petitioner is held under the authority of a State cannot affect the question of the power or jurisdiction of the Circuit Court to inquire into the cause of his commitment, and to discharge him if he be restrained of his liberty in violation of the Constitution."

And in Frank v. Mangum, 1915, 237 U.S. 309, 331, 35 S.Ct. 582, 588, 59 L.Ed. 969, Mr. Justice Pitney said:

"There being no doubt of the authority of the Congress to thus liberalize the common law procedure on *habeas corpus* in order to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution or a law or treaty established thereunder, it results that under the sections cited a prisoner in custody pursuant to the final judgment of a state court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, although it may become necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the state court to proceed to judgment against him."

Now the Commonwealth of Pennsylvania attacks the constitutionality of the 1867 extension of the habeas corpus provisions. It minimizes the forthright statement from Ex parte Royall as dictum. With this we disagree. We think it one of the bases of decision. But whether decision or dictum the correctness of its doctrine may of course be challenged again.

The Commonwealth argues that Congress may not empower a federal court to re-examine findings of fact by state tribunals otherwise than by ordering a new trial, and points to the Seventh Amendment.[4]

▆▆▆ We do not find in this proceeding for habeas corpus any re-examination of facts found by a state court. Our problem is to determine whether the things that were done in the state court in prosecuting a man for a criminal offense were so unfair as to deprive him of a right under the Constitution of the United States. A reference to the Seventh Amendment seems to us wide of any mark to be shot at here. This for several reasons.

In the first place no facts were tried by a jury or by the court, for Elliott pleaded guilty. Again, Moore makes it clear that the Seventh Amendment was

---

2. 14 Stat. 385.

3. This statement is from the dissenting opinion of Mr. Justice Frankfurter in Darr v. Burford, 1950, 339 U.S. 200, 221, 70 S.Ct. 587, 599, 94 L.Ed. 761. The opinion gives a short summary of the change made by the 1867 statute.

4. "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S.Const. Amend. VII.

intended to apply only to civil cases.[5] Third, the argument fails to distinguish between review of trial of facts and the question of violation of constitutional rights of one held in custody. Two Supreme Court quotations make this clear.

█ Thus in 1807 Chief Justice Marshall stated in Ex parte Bollman, 4 Cranch 75, 101, 8 U.S. 75, 101, 2 L.Ed. 554:

> "It has been demonstrated at the bar, that the question brought forward on a *habeas corpus*, is always distinct from that which is involved in the cause itself. The question whether the individual shall be imprisoned, is always distinct from the question whether he shall be convicted or acquitted of the charge on which he is to be tried, and therefore, these questions are separated, and may be decided in different courts."

Many years later, Mr. Justice Frankfurter stated in Watts v. Indiana, 1949, 338 U.S. 49, 50–51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801:

> "On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State courts and are not open for reconsideration by this Court. Observance of this restriction in our review of State courts calls for the utmost scruple. But 'issue of fact' is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication."

█ We have the same difficulty with the second point urged by counsel for the Commonwealth. He argues that unless the district court be regarded as exercising an appellate revisory jurisdiction over the state courts this is a suit against Pennsylvania and beyond the federal judicial power. It is hardly necessary to say that we have no intention of going beyond constitutional judicial power in sanctioning a suit against the state. But we think to argue that the habeas corpus proceeding is a suit against Pennsylvania is not an accurate way to describe its nature. From the beginning habeas corpus has been the means by which one who claims to have been held in illegal custody of another has the right to have the legality of his custody determined. The writ proceeds against the custodian. If it is found the custody is illegal, the custodian is directed to discharge the person detained. See Ex parte Tom Tong, 1883, 108 U.S. 556, 2 S.Ct. 871, 27 L.Ed. 826; Cross v. Burke, 1892, 146 U.S. 82, 13 S. Ct. 22, 36 L.Ed. 896; McNally v. Hill, 1934, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238. The discussion of habeas corpus in Blackstone [6] shows clearly that author's conception of the writ is not a suit against the crown. Rather "the king is at all times entitled to have an account why the liberty of any of his subjects is restrained" and "the extraordinary power of the crown is called in to the party's assistance."[7] Note also the language of Mr. Justice Peckham, speaking for the Court, in Ex parte Young, 1908, 209 U.S. 123, 167–168, 28 S.Ct. 441, 457, 52 L.Ed. 714. He is speaking of the supreme authority which arises from the Constitution:

> "This supreme authority * * is nowhere more fully illustrated than in the series of decisions under the Federal *habeas corpus* statute (§ 753, Rev. Stat.), in some of which cases persons in the custody of state officers for alleged crimes

---

5. 5 Moore's Federal Practice 70–82 (2d ed. 1951).

6. 3 Bl.Comm. * 129 ff.

7. Id. at * 131, 132.

against the State have been taken from that custody and discharged by a Federal court or judge, because the imprisonment was adjudged to be in violation of the Federal Constitution. The right to so discharge has not been doubted by this court, and it has never been supposed there was any suit against the State by reason of serving the writ upon one of the officers of the State in whose custody the person was found. In some of the cases the writ has been refused as matter of discretion, but in others it has been granted, while the power has been fully recognized in all."

And see Mr. Chief Justice Vinson's discussion in Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 689–690, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628:

> "There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign. * * *
>
> "A second type of case is that in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional. Actions for *habeas corpus* against a warden and injunctions against the threatened enforcement of unconstitutional statutes are familiar examples of this type. Here, too, the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign."[8]

There seems nothing more for us to add to these very positive statements.

Since 1867 the Habeas Corpus Act has been availed of in many cases where the custody called into question has been that exercised by a state officer over a prisoner convicted of crime. The following is a partial list of such cases. Holden v. Minnesota, 1890, 137 U.S. 483, 11 S.Ct. 143, 34 L.Ed. 734; In re Shibuya Jugiro, 1891, 140 U.S. 291, 11 S. Ct. 770, 35 L.Ed. 510; McKane v. Durston, 1894, 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867; Andrews v. Swartz, 1895, 156 U.S. 272, 15 S.Ct. 389, 39 L.Ed. 422; Bergemann v. Backer, 1895, 157 U.S. 655, 15 S.Ct. 727, 39 L.Ed. 845; Kohl v. Lehlback, 1895, 160 U.S. 293, 16 S. Ct. 304, 40 L.Ed. 432; Craemer v. Washington State, 1897, 168 U.S. 124, 18 S. Ct. 1, 42 L.Ed. 407; Crossley v. California, 1898, 168 U.S. 640, 18 S.Ct. 242, 42 L.Ed. 610; Storti v. Massachusetts, 1901, 183 U.S. 138, 22 S.Ct. 72, 46 L.Ed. 120; Rogers v. Peck, 1905, 199 U.S. 425, 26 S.Ct. 87, 50 L.Ed. 256; Felts v. Murphy, 1906, 201 U.S. 123, 26 S.Ct. 366, 50 L.Ed. 689; Valentina v. Mercer, 1906, 201 U.S. 131, 26 S.Ct. 368, 50 L. Ed. 693; Hunter v. Wood, 1908, 209 U. S. 205, 28 S.Ct. 472, 52 L.Ed. 747; Frank v. Mangum, 1915, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969; Collins v. Johnston, 1915, 237 U.S. 502, 35 S.Ct. 649, 59 L.Ed. 1071; Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Knewel v. Egan, 1925, 268 U.S. 442, 45 S.Ct. 522, 69 L.Ed. 1036; United States ex rel. Kennedy v. Tyler, 1925, 269 U.S. 13, 46 S.Ct. 1, 70 L.Ed. 138; Ashe v. United States ex rel. Valotta, 1926, 270 U.S. 424, 46 S.Ct. 333, 70 L. Ed. 662; Wade v. Mayo, 1948, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647; Dowd v. United States ex rel. Cook, 1951, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215; Sweeney v. Woodall, 1952, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114; Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 437, 97 L.Ed. 469; United States ex rel. Smith v. Baldi, 1953, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549.

---

**8.** In this case, the suit was alleged to be one against the United States. "But it cannot be doubted that the question whether a particular suit is one against the State * * * must depend upon the same principles that determine whether a particular suit is one against the United States." Tindal v. Wesley, 1897, 167 U.S. 204, 213, 17 S.Ct. 770, 773, 42 L.Ed. 137.

In view of this well-settled line of review by the Supreme Court of the United States without the slightest suggestion that either it or the inferior federal courts were acting beyond their constitutional power, it would indeed take a very strong argument to induce an intermediate court to say the whole series of cases is a usurpation of authority conferred by the Constitution. We have heard no such argument.

We think there is something deeper to the attack on our jurisdiction here than the not well-founded argument that habeas corpus proceedings in this situation constitute a suit against a state. The real reason, it is fair to believe, is a not unnatural irritation that the review of state courts comes at the inferior federal court level. The point is phrased at page 39 of the last Annual Report of the Director of the Administrative Office of the United States Courts (1953) as follows:

"State officials, although recognizing the propriety and constitutional necessity of review of State court convictions by the United States Supreme Court, assert, with some reason, that it is inappropriate for Federal district courts to engage in a process which in fact constitutes a review of State appellate court decisions. The difficulty is to balance these public interest considerations against the need and importance of maintaining the availability of the writ as a protection of individual liberty, if only in a few cases."

The battle against federal interference with some of these state processes

was lost when the Fourteenth Amendment was adopted. The Amendment, as every high school boy knows, forbids states to deprive a person of life, liberty or property without due process of law. That necessarily confers federal power to prevent states from doing the forbidden thing. Then the Amendment goes on and by express terms gives the Congress the power to enforce the provisions by appropriate legislation.[9]

That the Fourteenth Amendment was meant to accomplish a very substantial increase in federal authority is proved by studies made by scholars of the Amendment when proposed in the Congress and when it was before the states for adoption. One of these studies was made by Dr. Horace Edgar Flack and called The Adoption of the Fourteenth Amendment. Dr. Flack declares that one is venturing little in saying that the main purpose of the radical leaders in the Thirty-ninth Congress in proposing the first section of the Amendment "was to increase the power of the Federal Government very much, but to do it in such a way that the people would not understand the great changes intended to be wrought in the fundamental law of the land."[10] And, speaking of the first section of the Amendment when the proposal was before the Congress, he says, "there was no controversy or misunderstanding as to its purpose and meaning. The minority opposed it because they objected to increasing the power of the Federal Government, while the majority supported it for this very reason."[11]

This was the basis upon which the proposed Amendment was attacked by

---

9. " * * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *."
 "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S.Const. Amend. XIV, §§ 1, 5.

10. Flack, The Adoption of the Fourteenth Amendment 69 (1908).

11. Id. at 81. See also 2 Warren, The Supreme Court in United States History 540 (Rev.ed.1937), quoting from

Charles Wallace Collins' The Fourteenth Amendment and the States 10 (1912): "They desired to nationalize all civil rights; to make the Federal power supreme; and to bring the private life of every citizen directly under the eye of Congress. This intention of the Radicals, though too much involved for the people in general to comprehend, was quite generally understood by the leading editors in the North and in the South and by the party leaders on both sides."

Secretary Oliver H. Browning, a member of the President's cabinet, in a letter written Oct. 13, 1866, and cited by Dr. Flack on page 146 of his work. Mr. Browning declared that the purpose of the due process clause "was to subordinate the state judiciaries to federal supervision and control * * *." And in the Pennsylvania legislature, when ratification was in issue, a Mr. Jones, opposing ratification, argued that by the last clause of section one "the State would not be allowed to be the judge of its own laws, even in criminal proceedings, since it gave the Federal courts the power to determine whether a man was imprisoned unjustly or whether he was deprived of his life, liberty, or property without due process of law."[12]

Those opposing a measure of whatever sort not infrequently tend to magnify the alleged dangers involved. But Dr. Flack's study shows that at least some of the lawmakers, state and federal, realized that there was involved in section one of the Fourteenth Amendment a very great increase in federal authority over state processes.

■ We cannot have any doubt, even were the question a new one, that the federal power is ample, under the Constitution, to authorize the use of habeas corpus procedure to test the question whether one confined under state process is, in that confinement, deprived of his rights under the Constitution of the United States. Nor have we doubt that the power may be assigned to all the federal judiciary or part of it. If the authority of federal courts is to be more limited than that provided by the present statute, that limitation must be made by the Congress.

While such a legislative policy question is not one for this Court it is worth calling attention to Supreme Court language in the case of Wade v. Mayo, 1948,

334 U.S. 672, 681–682, 68 S.Ct. 1270, 1275, 92 L.Ed. 1647. The Court said:

"Fear has sometimes been expressed that the exercise of the district court's power to entertain *habeas corpus* petitions under these circumstances might give rise to frequent instances of a single federal judge upsetting the judgment of a state court, often the highest court of the state. But to restrict the writ of *habeas corpus* for such reason is to limit it on the basis of a discredited fear. Experience has demonstrated that district court judges have used this power sparingly and that only in a negligible number of instances have convictions sustained by state courts been reversed. Statistics compiled by the Administrative Office of the United States Courts show that during the fiscal years of 1943, 1944 and 1945 there was an average of 451 *habeas corpus* petitions filed each year in federal district courts by prisoners serving state court sentences; of these petitions, an average of but 6 per year resulted in a reversal of the conviction and a release of the prisoner. The releases thus constituted only 1.3% of the total petitions filed. In light of such figures, it cannot be said that federal judges have lightly exercised their power to release prisoners held under the authority of a state."[13]

## II.

The second problem is the merits of Elliott's appeal to us from the district court. On this question, as in similar cases heretofore, our opinion is divided. But the majority thinks that the judgment must be affirmed.

In the above recital of facts nothing was stated which made Elliott's case

---

12. Flack, op. cit. supra note 10, at 185–186.

13. See also on the statistical side the appendix to Mr. Justice Frankfurter's opinion in Brown v. Allen, 1953, 344 U.S. 443, 514, 526, 73 S.Ct. 437, 97 L.Ed. 469.

any different from any other first degree murder case tried in the courts of Pennsylvania. The questions before us center around additional facts growing out of previous litigation in this Court which eventually ended in the Supreme Court of the United States. The case was United States ex rel. Smith. v. Baldi, 3 Cir., 192 F.2d 540, affirmed, 1953, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549. Between the time that case was heard in this Court and the time it was decided by the Supreme Court, there was filed, with the Supreme Court's permission, an affidavit by Thomas D. McBride, Esquire, bringing to the Court's attention the mental condition of Dr. Drayton, who had been a witness in the Smith case and who was consulted by the sentencing court in this case. The substance of that affidavit was that Dr. Drayton had suffered a deterioration in mental health; that in January, 1951, the deterioration was observed at the clinical level; and that on September 18, 1951, he had been committed to an institution.[14] The facts alleged in this affidavit must be taken to be true at this point, for there never has been litigation to give anybody a chance to test their accuracy. It will be noted by checking the dates in the affidavit that it was not until six months after Dr. Drayton had reported to the trial court in this case that his illness was observed at the clinical level and that it was eight months after that before he was committed to a hospital. It is admitted that, at the time the Court of Oyer and Terminer asked for and received a report from Dr. Drayton, neither the court nor the prosecuting attorney nor, so far as we know, anyone connected with the case had any knowledge or any suspicion of the doctor's mental illness. In fact, we do not know whether there was any mental illness in July, 1950, except for the general allegation in relator's petition that Dr. Drayton was suffering

from the disease as early as 1949. That, again, we must at this stage of litigation take as true.

We must remind ourselves always that in these proceedings we are not a reviewing court for the correction of errors. Nor do we possess the pardoning power of the State of Pennsylvania (which already has been exercised against Elliott). Nor have we authority to subject Elliott to an inquiry by a commission under the Mental Health Act of 1951, 50 P.S.Pa. § 1051 et seq., as was finally done to the defendant in the Smith case.[15] Our sole problem is to determine whether this prisoner has been dealt with with such lack of fairness that we may say that he has not been given due process of law. All this is, of course, trite but, like a text for a sermon, seems to need repetition from time to time.

The district judge put the questions clearly in the following language: "The relator is asking for a hearing in order to establish (1) that Dr. Drayton, the court-appointed psychiatrist, was so mentally impaired at the time he made his report as to render any opinion contained in it worthless, (2) that the report was incomplete and contained an erroneous conclusion as to the relator's mental condition, and (3) that the report caused the sentencing court to fix the penalty at death instead of life imprisonment." As the district judge also pointed out in the course of his opinion, "The ground for this application is exactly the same as that upon which the petition for a writ of habeas corpus to the state court was based." It is peculiarly, therefore, the type of case in which the Supreme Court has admonished us to proceed with very great caution:

"Applications to district courts on grounds determined adversely to the applicant by state courts should

14. Dr. Drayton died in that institution in March, 1953.

15. As a result of this inquiry, Smith was committed by Judge Levinthal, of the

Court of Common Pleas No. 6, Philadelphia, to the Farview State Hospital on March 23, 1953.

[result in] * * * a refusal of the writ without more, if the court is satisfied, by the record, that the state process has given fair consideration to the issues and the offered evidence, and has resulted in a satisfactory conclusion." Brown v. Allen, 1953, 344 U.S. 443, 463, 73 S.Ct. 397, 410, 97 L.Ed. 469.

And see United States ex rel. Smith v. Baldi, 1953, 344 U.S. 561, 569–570, 73 S.Ct. 391, 97 L.Ed. 549.

The McBride affidavit got into the Elliott case sometime during its progress from the Court of Oyer and Terminer to the Supreme Court of Pennsylvania.[16] It was not referred to in the first opinion, but the second time the case was before the Supreme Court of Pennsylvania (on appeal from the denial of habeas corpus by the Court of Common Pleas), Mr. Justice Bell, who wrote the opinion for the court, said, in a footnote, that the court had had the affidavit at the time the first opinion was handed down but did not think it of sufficient significance to comment upon, 373 Pa. at page 492 note, 96 A.2d at page 124 note 1. The affidavit was thoroughly considered in the second opinion, however, and the court concluded its opinion with the statement that: "It may not be amiss to add that, irrespective of any technicalities, if we believed that the sentencing Court was misguided by Dr. Drayton's testimony and that it imposed its sentence upon an erroneous state of assumptions or material facts which guided or controlled its decision, we would grant the writ in accordance with the principle of *Townsend v. Burke*, 334 U. S., supra." 373 Pa. at page 496, 96 A. 2d at page 126. So we have here a case where the ground has been thoroughly trodden by the Supreme Court of Pennsylvania as well as by the federal district court. The industry and patience of the prisoner's counsel have forgotten no possible points to be urged in his favor.

In the exercise of that industry counsel have taken inconsistent positions with regard to the effect of psychiatric material. In the first appeal to the Pennsylvania Supreme Court the complaint was that the sentencing court did not pay sufficient attention to the psychiatric advice given it. Then, in the same appeal, after the McBride affidavit came to light, counsel changed position and urged that the Drayton report, written by an allegedly ill man, was given too much influence and that the "too much influence" deprived Elliott of due process of law. We by no means blame counsel for bringing up everything in the client's favor which they can. But the change of course from windward to leeward, with regard to the psychiatric report, cannot but create the impression that counsel are seeking for their client any port in a storm, and the objection now urged is an afterthought.

To avoid any possible confusion it is worth saying, as has been said both in the state court and the district court, that it is not and has not been contended that Elliott is or was "insane" as that word is used in Pennsylvania law. The Pennsylvania rule is that of the McNaughton case [10 Clark & F. 200] and that position has been reiterated as recently as November 17, 1953, in Commonwealth v. Patskin, 375 Pa. 368, 100 A.2d 472, certiorari denied, 1954, 347 U.S. 931, 74 S.Ct. 534. A report to defendant's counsel by Dr. Matthew T. Moore, a matter which will be discussed later, stated that Elliott was "mentally ill" but contained no suggestion that he was insane in the McNaughton case meaning of that term. As previously stated, Dr. Drayton found that Elliott is mentally deficient. Relator does contend that he falls in that area of mental illness between legal insanity and mental deficiency.

■■ Under the Pennsylvania statute providing for psychiatric examination of a convicted defendant, it is well established that the reference is discre-

---

16. Counsel for defendant learned of the affidavit on April 10, 1952.

tionary with the court.[17] The Patskin case shows that the responsibility for determining the sentence is that of the court, not the psychiatrist or the commission, and that except for abuse of discretion the court's determination will not be set aside. In the statutory language the consultation is to "guide" the court. How much of a due process question is there with regard to the consultant to whom a court turns for guidance? One may suppose a case where it consults so old-fashioned a psychiatrist that his views are considered hopelessly out of date by a majority of his practicing colleagues. Or one may suppose a psychiatrist so far in advance of the majority of the profession that his professional opinions are considered unsound and dangerous. Is there lack of due process in a court's consulting such a person? Is his report lacking in due process because it does not discuss fully all the things which counsel wants discussed? We do not think matters of this kind involve a question of lack of due process, although they may properly be considered and urged against the weight of the report when it is received. Indeed, counsel for Elliott did just that in the Court of Oyer and Terminer after Dr. Drayton's report had been received. He objected to what he claimed were omissions in the report. He criticized alleged mistakes of fact and he brought forward the letter from Dr. Matthew Moore already referred to. Dr. Moore and Dr. Drayton both agreed that Elliott is a middle grade moron. Dr. Moore did disagree with Dr. Drayton about mental illness. Dr. Moore thought Elliott both mentally deficient and mentally ill. Dr. Drayton thought him only mentally deficient.[18]

Questions about Dr. Drayton's advice, even though we assume as true all the facts in the McBride affidavit, become less significant when the larger picture is looked at. In the first place the Supreme Court of the United States had the McBride affidavit in United States ex rel. Smith v. Baldi, already referred to. The Supreme Court of Pennsylvania has pointed out the Smith case was a stronger one for the defendant than this, 373 Pa. at page 496, 96 A.2d at page 126. Be that as it may, having the affidavit the majority of the Supreme Court of the United States, despite a vigorous dissent, did not find that the facts therein contained created want of due process in the handling of the case in Pennsylvania. In the second place, as Judge Kirkpatrick pointed out, the sentencing court "has had before it practically the whole history of the re-

17. See cases cited in Commonwealth v. Patskin, 375 Pa. at page 372, 100 A.2d at page 474.

18. The point was made at argument here that Dr. Drayton did not qualify under the statute of 1933, which provides that the psychiatrist to be consulted must be "employed by the State Department of Welfare or * * * in any State hospital or in any mental hospital maintained by the county." Act of May 2, 1933, P.L. 224. As previously stated, Dr. Drayton had been chief of the Philadelphia General Hospital psychiatric department, and associate professor of neuropsychiatry in the Graduate School of Medicine of the University of Pennsylvania, but he had ceased to occupy these posts at some time during 1949. He was, however, still connected with the Municipal Court of Philadelphia when he examined Elliott. We are informed by counsel that neither the court nor counsel knew at the time of sentencing that Dr. Drayton was no longer associated with these institutions.

We have found no Pennsylvania cases interpreting the requirement just quoted. In the absence of Pennsylvania authority, we think it was designed to provide a public official who could be called upon to furnish an opinion without fee. It is to be noted that the 1951 statute adds a reference to a psychiatrist who is "a qualified physician who, by a minimum of five (5) years of training and experience, has acquired specialized skill and learning in mental and nervous disorders and related conditions and who has thereby achieved professional standing in the medical specialty of psychiatry." Pa. Stat.Ann. tit. 50, § 1072(3). We do not think that the fact that Dr. Drayton was no longer a member of a staff of a public mental institution at the time he examined Elliott makes the court's receiving an opinion from him lack of due process.

lator from boyhood and a mass of psychological and psychiatric examinations made by competent physicians at various times when he was committed to correctional institutions for a variety of criminal offenses. The relator appeared before the sentencing court and testified and, in addition, the trial judge, one of the members of that court, had had an opportunity to observe the manner in which he conducted himself during the five days of his trial."

 We think the language from Frank v. Mangum, 1915, 237 U.S. 309, 326, 35 S.Ct. 582, 586, 59 L.Ed. 969, is appropriate to apply as the test of our obligation here. It is:

> "As to the 'due process of law' that is required by the Fourteenth Amendment, it is perfectly well settled that a criminal prosecution in the courts of a State, based upon a law not in itself repugnant to the Federal Constitution, and conducted according to the settled course of judicial proceedings as established by the law of the State, so long as it includes notice, and a hearing, or an opportunity to be heard, before a court of competent jurisdiction, according to established modes of procedure, is 'due process' in the constitutional sense." (Citations omitted.)

We think that by this test Elliott has had due process of law.

The judgment of the district court will be affirmed.

BIGGS, Chief Judge (concurring in part and dissenting in part).

The relator, Elliott, represented by counsel at his trial and throughout all subsequent proceedings, was tried in the Court of Oyer and Terminer in Philadelphia County on a charge of murder for the brutal killing of a police officer in the course of an armed robbery. He pleaded "Not Guilty" but after several days of trial changed his plea to "Guilty". It then became the duty of the Court to determine the degree of Elliott's crime and the penalty to be imposed upon him.[1] Three Judges sat to determine these issues. Asserting that Elliott was a "mental defective", but not that he was "insane", his counsel made application for his "mental examination" pursuant to the Act of May 2, 1933, P.L. 224, as amended by the Act of June 20, 1935, P.L. 352, 19 P.S. Pa. § 1153.

The Act provided that on the conviction of any person for a criminal offense, on the application of the defendant's counsel, the Court should defer sentence until a "report" of a mental examination of the defendant could be secured to "guide" the Court in determining the disposition to be made of the defendant. The Act also provided that the examination should be made by a psychiatrist employed by the State Department of Welfare or in any mental hospital maintained by the county.[2]

---

1. See Commonwealth v. Jones, 1947, 355 Pa. 522, 525, 50 A.2d 317, 319, and Commonwealth v. Berkenbush, 1920, 267 Pa. 455, 461, 110 A. 263, 265. See also Section 701 of the Penal Code of the Commonwealth of Pennsylvania, 18 P.S.Pa. § 4701.

2. The Act, repealed June 12, 1951, P.L. 533, provided:

"Section 1. Be it enacted, &c., That in case of the conviction of any person for any offense, the trial judge may, on his own initiative, or on the application of the district attorney, the defendant, or counsel for the defendant or other person acting for the defendant, defer sentence until the report of a mental examination of the defendant can be secured to guide

the judge in determining what disposition shall be made of the defendant.

"Section 2. The trial judge shall have power to require such mental examination, and report thereon, to be made by a psychiatrist employed by the State Department of Welfare or by a psychiatrist employed in any State hospital or in any mental hospital maintained by the county. Such report, when furnished to the judge, shall be available to counsel for defendant and to the district attorney.

"The psychiatrist making such examination shall not be entitled to any compensation for making such examination and report, but shall be paid by the county his actual expenses, on bills approved by the trial judge.

The Court had offered to it by Elliott's counsel a record of Elliott's condition and treatment at the St. Luke's and Children's Hospital following his being struck by an automobile on or about February 9, 1937, when he was ten years old, and certain other reports of a neuro-psychiatric nature relating to Elliott which need not be detailed here. The Court evinced little doubt as to how it should proceed. It is clear beyond any doubt from the statements made by the three Judges that they concluded that the records should be turned over to a psychiatrist, to be designated by the Court, and that the Court would be guided by the report of that psychiatrist in the disposition of Elliott in accordance with the provisions of the Pennsylvania statute quoted in note 2, supra. The Court made an order on June 20, 1950 [3] designating Dr. William Drayton, Jr. as the psychiatrist.

On July 6, 1950 Dr. Drayton reported to the Court that Elliott was a middle grade moron, that the St. Luke's and Children's Hospital record showed that he had sustained no skull fracture, that he was mentally defective, a fabricator of the first water, of a low order of intelligence but possessed of a certain amount of native shrewdness, and that he gave no evidence of being "mentally ill." Thirteen days later, on July 19, counsel for Elliott wrote a letter to the Judge who had tried Elliott, a member of the Three Judge Court, and objected inter alia to lack of any "reference" in the report to other reports given to Dr. Drayton and to the fact that an entry in the St. Luke's and Children's Hospital report did indicate that Elliott's skull had been fractured on the occasion when he was hit by an automobile on February 9, 1937. On April 10, 1951 the Three Judge Court of Oyer and Terminer filed an opinion in which it adjudged Elliott to be guilty of murder in the first degree and fixed the penalty at death.[4] In this opinion the Court made no direct

"Section 3. If the report of the examination by the psychiatrist shows that the defendant though not insane is so mentally ill or mentally deficient as to make it advisable for the welfare of the defendant or the protection of the community that he or she be committed to some institution other than the county prison, workhouse or a penitentiary, the trial judge shall have power by virtue of this act to commit such defendant to any State or county institution provided for the reception, care, treatment and maintenance of such cases or similar mental cases, in lieu of a sentence to a county prison, workhouse or penitentiary where required by a relevant act of Assembly or by law, and to direct the detaining of the defendant in such institution until further order of the court. The trial judge shall, at the time of such commitment, make an order upon the defendant, or such person or persons responsible for the support of the defendant, or upon the county or the Commonwealth, as may be proper in such case, for the cost of admission, care and discharge of such defendant.

"From any order of commitment heretofore or hereafter made by the court to any State or county institution provided for the reception, care, treatment and maintenance of mental patients, an appeal shall lie in the same manner and with like effect as if sentence to a prison, workhouse or penitentiary had been imposed in the case. Such appeal may be taken by either the defendant or the attorney for the defendant.

"Section 4. Nothing contained in this act shall be construed to conflict with or repeal any portion of the Mental Health Act of one thousand nine hundred and twenty-three, and the amendments thereto."

3. The order does not appear in the record before this court. The substance of it, however, is set out in paragraph "2" of the "Petition to Incorporate into Record Reports, etc., and Further Evidence as to Mental Condition of Defendant and to Vacate Sentence of Death," filed in the Court of Oyer and Terminer on or about May 2, 1951. The making of the order in the terms stated in paragraph "2" was admitted by the Commonwealth in its answer to the petition.

4. See the opinion of the Supreme Court of Pennsylvania in Commonwealth v. Elliott, 1952, 371 Pa. 70, 73–74, 89 A.2d 782, 784–785, which quotes excerpts from the opinion of the Court of Oyer and Terminer.

reference to the Drayton report.[5] Insofar as the "mental level" of Elliott was concerned, the Court seemed to rely at least to some extent on the Drayton report. The Court sentenced Elliott to death.

On May 2, 1951 Elliott's counsel filed a "Petition to Incorporate into Record Reports, etc., and Further Evidence as to Mental Condition of Defendant and to Vacate Sentence of Death", referred to in note 3, supra. This petition sets up a number of respects in which the opinion of the Court and the report of Dr. Drayton were deemed to be insufficient by counsel for Elliott. The petition states, among other things, that while Elliott's counsel had presented no evidence as to the background and mental condition of Elliott they had called to the Court's attention certain reports of a neuro-psychiatric character in their letter of July 19, including a report of the Glen Mills Schools, a State institution for juvenile delinquents, and a report of a psychologist referred to in that report, a report of the Bureau for Colored Children, a report of Dr. Davidson of the Municipal Court, a summary of the report of St. Luke's and Children's Hospital, and a report of Elliott's school record prior to March, 1937, and subsequent thereto. The petition ended with the prayer that all the reports be incorporated in the record, that the death sentence be set aside and a sentence of life imprisonment be imposed on Elliott and that his counsel be afforded an opportunity to present to the Court further medical and psychiatric testimony which in the opinion of Elliott's counsel would warrant the imposition of a sentence of life imprisonment. It appears from the statements made by Elliott's counsel, and it is not disputed, that following the imposition of the death sentence upon

Elliott, an "investigator" was employed who, in the course of his investigation procured at least some of the additional reports referred to immediately above.[6]

It is unnecessary in this opinion to treat in detail these various reports for they are in the record and may be more advantageously read than repeated herein. In respect to the St. Luke's and Children's Hospital report it appears, as we have stated, that Elliott sustained a head injury by being struck by an automobile when he was ten years old. The hospital record is not clear as to the extent of his head injuries. There was clearly a scalp infection, perhaps of a superficial nature. The record states, however: "On 2–16–37, X-ray reveals overriding and depressed fracture of skull in right front and parietal region." There is also the statement: "A depressed fracture. There is an area in the right frontal bone which resembles the deformity of a depressed fracture." But there is also a *pink* sheet in the hospital record which shows that Elliott was X-rayed by an experienced roentgenologist and this sheet states that Elliott had sustained no skull fracture. A report contained in a report from the Glen Mills Schools by a psychologist dated November 20, 1939 states that Elliott's intellectual inferiority is very apparent and that it is unlikely that he will make further progress for he shows no capacity for intelligent reasoning; that he is childish, irresponsible and easily led with very superficial understanding of moral values. A report from the Neuro-Psychiatric Clinic of the House of Detention, November 22, 1939, states: "This boy is mentally defective. He is extroverted and hyperactive and his activities with knives leads to the conclusion that he is dangerous. He volunteers symptoms of cerebral trauma,

5. The single reference to the mental capacity or mental competence of Elliott is as follows: "Although his mental level is allegedly low as measured by psychological testing, he exhibited throughout the trial an innate shrewdness and sharp perception."

6. There was also included among the records a report made by Dr. Drayton on August 2, 1938. It stated: "A high grade moron whose intellectual development will be quite limited * * *." In his report of July 6, 1950, Dr. Drayton made no reference to his own earlier report or prior examination of Elliott.

headache and noises." The psychiatrist, Dr. Davidson, recommended "Hospitalization for therapeutic encephalography". The diagnosis of Elliott's condition was "Middle-Grade Moron, [Possible [7]] Cerebral Trauma". A later report of the Neuro-Psychiatric Clinic of the House of Detention, October 15, 1942, states, "This boy is mentally deficient * * * and reasons on a middle grade moron basis. * * * He is not to be trusted at all and he is set on a dangerously lawless life. Has not profited by Glen Mills. His record is long and significant. In it are at least two knife episodes and now comes implication in an armed hold-up." The psychiatrist recommended that he be sent to Huntingdon, another State institution for delinquent minors and the diagnosis was "Middle Grade Moron, Constitutional Psychopathic Inferior." Dr. Leopold of the Municipal Court of Philadelphia also made a "Psychiatric Summary" of Elliott in part as follows: "This young man is a Middle-grade Moron with psychopathic traits and with a special tendency to aggressive reaction." The reports referred to in this paragraph and the views of the psychiatrists involved demonstrate, unless these persons were unseeing or frivolous in their observations, that Elliott was a psychotic from an early age and remained such. His criminal record is as long and involved as his psychiatric record. His criminal record embraces many crimes of violence.

After Dr. Drayton filed his report a further hearing was had before the Court of Oyer and Terminer and a little testimony was taken but the evidence adduced was of small relevancy. Elli-

ott's counsel, though expressly not contravening Dr. Drayton's report, nonetheless insisted that Elliott's mental deficiency was such that he had a "diminished responsibility" for his criminal acts. The Court asked whether any of the reports indicated that Elliott had the power of perception between "right and wrong",[8] the test of criminal responsibility imposed by the M'Naghten Rules, 8 House of Lords 200 (8 English Reports 718, X Clark and Finnelly 198), and adopted as the law of Pennsylvania, Commonwealth v. Mosler, 1846, 4 Pa. 264. Elliott's counsel insisted that they were close to "that" in a report of September 26, 1940. This report, however, does not seem particularly illuminating. The Court ordered that "Everything that militates in favor of this defendant, particularly by way of showing his past life and mental condition, should be made a part of this record." The Court, however, went on to say that the case at this date, October 24, 1951, was in the Supreme Court of Pennsylvania, an appeal having been taken. The Court of Oyer and Terminer refused to set aside the death sentence. The Supreme Court of Pennsylvania affirmed the judgment of conviction and the judgment of sentence. See Commonwealth v. Elliott, 371 Pa. 70, 89 A.2d 782.

Elliott filed a petition for *habeas corpus* in the Court of Common Pleas of Philadelphia County. In this petition his counsel attacked the competency of the report made by Dr. Drayton and Dr. Drayton's own mental competency. The petition also alleged that Elliott's "psychiatric records" were examined by Dr. Matthew T. Moore, an accredited psy-

7. This paper is printed twice in the record which was before the Supreme Court of Pennsylvania on the appeals from the judgment and sentence of Elliott. In one printing a question mark follows the word "Trauma"; the other printing is devoid of such a mark. Because of this I have interpolated the word "Possible" in the quotation which otherwise is exact.

8. The Attorney for the Commonwealth stated, "There is no evidence to indicate that this defendant was not conscious

of the act he was performing. There is no evidence that he did not know the difference between *right* and *wrong*. There are periods that this defendant showed clear signs of conforming notably in the various places where he was employed." (Emphasis added.)

The visible ghost of the M'Naghten Rules continues to haunt the mansion of Pennsylvania law. See Commonwealth v. Patskin, 1953, 375 Pa. 368, 371, 100 A.2d 472, 473.

chiatrist, who stated that it was his conclusion that Elliott was "both mentally defective and mentally ill prior to 1950, and is still mentally ill", and that "The descriptive phase of Dr. William Drayton Jr.'s report and his diagnosis adequately describe defendant's mental condition with the exception of his last sentence." It is alleged that Dr. Moore went on to say: "His report [Dr. Drayton's] is essentially in accord with the conclusions reached by all the psychiatrists who had examined * * * [Elliott, but that] Dr. Drayton's final sentence: 'He [Elliott] shows no evidence of being mentally ill', is completely erroneous, and further directly contradicts * * * [Dr. Drayton's] observations and conclusions preceding it." The petition goes on to allege that Dr. Drayton was not qualified within the terms of the statute, quoted in note 2, supra, to serve the Court as an examining psychiatrist since as early as 1949 his connections with the necessary qualifying institutions no longer existed and as early as 1949 he himself was suffering from some form of senile dementia; that on September 20, 1951 Dr. Winifred Drayton, Dr. Drayton's wife, filed a petition for the appointment of a guardian for him, stating that owing to weakness of mind Dr. Drayton was unable to take care of his property; that on September 18,[9] 1951 Dr. Drayton was committed to the Pennsylvania Hospital for Mental Diseases and had remained there until October 12, 1951 when he was transferred to the Veteran's Hospital at Coatesville; that Dr. Drayton's condition was "nonrecoverable" with a medical description of "psychosis with cerebral arteriosclerosis"; that he was unable even to recognize his wife or friends; that he was confused, disturbed and overactive; that he had suffered progressive loss of memory and "confabulates to fill in memory defects" and that his intellectual deterioration was evident even on a clinical level in January, 1951; that at the time of Dr. Drayton's examination of Elliott and his report in July, 1950, Dr. Drayton's judgment and competency had been seriously impaired, and that "the report, with its numerous omissions, errors and contradictions was rendered valueless and should not [have] furnish[ed] the basis for the final action of the Court [of Oyer and Terminer] in determining the vital issue of whether death or life imprisonment should be imposed * * *" on Elliott; that at no time did Dr. Drayton testify in Court or was he examined by the Court or by counsel as to his findings and conclusions, and that the sentence of the Court of Oyer and Terminer without the report of a psychiatrist who was competent and qualified was a violation of the Fourteenth Amendment and nullified the jurisdiction of the Court of Oyer and Terminer. The petition prayed for the release of the relator from confinement pursuant to the death sentence and for a stay of execution. The Court of Common Pleas summarily refused the writ without requiring answer or hearing and an appeal was taken to the Supreme Court of Pennsylvania.

The Supreme Court of Pennsylvania affirmed the decision of the Court of Common Pleas. See Commonwealth ex rel. Elliott v. Baldi, 1953, 373 Pa. 489, 96 A.2d 122. Deciding that the issue of due process could be raised by application for *habeas corpus* the Court concluded that the writ would lie to correct a void or illegal sentence or a sentence imposed upon a mistake of law or of material important facts after-discovered but that no such situation was disclosed by the record before it. The Court seemingly was of the view that the question raised relating to the competency of Dr. Drayton and his alleged mental incapacity was not of sufficient importance to warrant discussion. See footnote, Commonwealth ex rel. Elliott v. Baldi, cited to the text, 373 Pa. at page 492, 96 A.2d at page 124. The Court referred to United States ex rel. Smith v. Baldi,

9. The correct date was September 20, 1951. September 18, 1951 was the date on which Dr. Winifred Drayton filed her petition in the Court of Common Pleas. The petitions for *habeas corpus* seemingly have transposed the dates.

1953, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549, as controlling the instant case and concluded [373 Pa. 489, 96 A.2d 126]: "That case is a far stronger case for the defendant than the instant case since in the instant case defendant and his attorney and Dr. Moore, his psychiatrist, as well as Dr. Drayton, the Commonwealth's psychiatrist, and all the prior history of the defendant agree that the defendant was *sane*, but was a moron or mentally deficient." (Emphasis added.) The court at this point of its opinion, 373 Pa. at page 496, 96 A.2d at page 126, appended a note. That note is as follows: "Dr. Moore, whose affidavit was attached to and made a part of the record in the present case, said in his letter to defendant's counsel dated October 17, 1952: 'After reviewing the detailed evidence in the record I must agree with the unanimous opinions rendered by the highly competent psychiatrists and neurologists to the effect that Elliott was indeed mentally deficient, a middle grade moron, * * *. His (Dr. Drayton's) report is essentially in accord with the conclusions reached by all the psychiatrists who had examined him.'"

The present writer entertains a high regard for the wisdom, judgment and accuracy of the Supreme Court of Pennsylvania. Nonetheless, he is constrained by the duty which he deems to be imposed upon him by Section 2241 of the Judiciary Code of the United States, Title 28, to point out what he deems to be an inadvertent error in the opinion of the Supreme Court of Pennsylvania which apparently influenced the judgment of that most competent tribunal. The statement that all authorities agreed that Elliott was "sane" including his own psychiatrist, Dr. Moore, is inaccurate unless a play upon words was being made between the definition of "insanity", the "knowing the difference between right and wrong" of the M'Naghten Rules, and being "mentally ill" as that phrase was used by Dr. Moore. I, of course, am of the opinion that the Supreme Court of Pennsylvania intended no such quibble. The inadvertent nature of the error is disclosed by the contents of the footnote to the opinion of the Supreme Court of Pennsylvania, quoted above, and no play on words was intended or projected.

The language employed by the distinguished opinion writer in the Supreme Court of Pennsylvania and quoted in the footnote was quoted by him from Dr. Moore's letter, which appeared as an attachment to Elliott's petition for *habeas corpus* in the Court of Common Pleas.[10] Inadvertently, there was omitted in the opinion of the Supreme Court of Pennsylvania certain phrases and sentences of Doctor Moore's letter. The periods in the footnote took the place of the following phrase and sentence from paragraph "(3)" of Dr. Moore's letter cited to the text of the opinion of the Supreme Court of Pennsylvania, viz., "both mentally defective and mentally ill." and, "It is unfortunate that the excellant recommendations of these physicians were not followed." There was also omitted from the note, apparently also intended to be covered by the periods, the following sentence from paragraph "(4)" of Dr. Moore's letter, viz., "The descriptive phase of Dr. William Drayton, Jr.'s report and his diagnosis adequately described defendant's mental condition with the exception of his last sentence." No reference was made in the opinion of the Supreme Court of Pennsylvania, to the second paragraph of "(4)", or to the contents of the paragraph numbered "(3)" of Dr. Moore's letter, or to the contents of the paragraphs of the letter numbered "(5)" and "(6)", though these state the evidentiary basis for the con-

---

10. The letter, which was also introduced as an exhibit in the proceedings in the court below, was from Dr. Moore to one of Elliott's counsel, is dated October 17, 1952, and consists of paragraphs, numbered 1 to 6. Each number covers a single paragraph save No. "(4)" which embraces two separate paragraphs. To the end that what is stated may be clear a verbatim copy of the letter is appended to this opinion.

clusion advanced by Dr. Moore that Elliott was not only *mentally deficient* but also *mentally ill*, was such at the time of the commission of the murder and remained so. Dr. Moore's letter terminates with the reiterated statement that Elliott was "mentally ill" as well as "mentally deficient".

The opinion of the Supreme Court of Pennsylvania ends with the following paragraph: "It may not be amiss to add that, irrespective of any technicalities, if we believed that the sentencing Court was misguided by Dr. Drayton's testimony and that it imposed its sentence upon an erroneous state of assumptions or material facts which guided or controlled its decision, we would grant the writ in accordance with the principle of Townsend v. Burke, 334 U.S. 736, 68 S. Ct. 1252 [92 L.Ed. 1690], supra. But it is obvious from the summary dismissal of the present application for habeas corpus, together with the prior opinion of the sentencing Court which we quoted at some length in Com. v. Elliott, 371 Pa. 70 [76], 89 A.2d 782, supra, that there is no reason or basis for a further review of Elliott's sentence by the lower Court or by this Court." It would appear therefore, and this assertion is made with great deference, that the Supreme Court of Pennsylvania did not meet the test which it itself laid down though purporting to adhere to the rule of Townsend v. Burke.

Application for certiorari was made to the Supreme Court of the United States and was denied. 1953, 345 U.S. 976, 73 S.Ct. 1125, 97 L.Ed. 1391. A petition for *habeas corpus* was then filed in the court below. The grounds alleged in the petition are substantially those alleged in the petition for *habeas corpus* filed in the Court of Common Pleas for Philadelphia County, the latter petition being attached and incorporated by express reference in the petition for *habeas cor-*

*pus* filed in the court below. That court concluded that the case was ruled by the decision of the Supreme Court in United States ex rel. Smith v. Baldi, supra, and that since the sentencing court "being fully aware of Dr. Drayton's commitment because of incurable mental disease," dismissed the application for *habeas corpus,* there was an unmistakable implication that the "disputed portion" of Dr. Drayton's report had not brought the sentencing court to its conclusion that Elliott should be found guilty of first degree murder and sentenced to death. The court below concluded that "The sentencing court was fully aware that the relator was a mental defective but obviously did not accept the argument that his mind was impaired to an extent sufficient to diminish his obligation for his crime." It pointed out that Elliott did not contend before it that he was insane though at argument his counsel suggested there might be doubt as to his sanity. It concluded that Elliott was not denied any constitutional right even on "giving the broadest scope to the concept of due process" and that it could not find that Elliott's trial and sentence were "unfair, unjust or vitiated by mistake of law or fact."[11] The appeal at bar followed.

This court points out in its opinion in this case that an issue relating to Dr. Drayton's competency was before the Supreme Court of the United States in United States ex rel. Smith v. Baldi, supra, in the form of an affidavit executed by Thomas D. McBride, Esquire.[12] But the majority opinion of the United States Supreme Court in the Smith case made no reference to the McBride affidavit, albeit the dissenting opinion of Mr. Justice Frankfurter did so. The McBride affidavit was not part of the "true" record which was before the Supreme Court of the United States and for this reason the present writer is of

---

11. No opinion was reported for publication.

12. As to the comment of the Supreme Court of Pennsylvania in respect to the McBride affidavit see footnote in Commonwealth ex rel. Elliott v. Baldi, 373 Pa. at page 492, 96 A.2d at page 124, as follows: "We did not consider the question raised by the McBride affidavit to be of sufficient importance to warrant specific discussion."

the opinion that the majority opinion of the Supreme Court did not pass upon the issue of Dr. Drayton's competency in the Smith case. Moreover, the issue as to Dr. Drayton's competency presented by the circumstances at bar is not only a different issue than that which was presented in the Smith case but it also differs very substantially as to degree.

In the Smith case while it is true that Dr. Drayton was called upon to express his judgment as to Smith's "sanity" or mental condition and did so, the Court of Oyer and Terminer did not act or purport to act pursuant to the Act of May 2, 1933, P.L. 224. See note 2, supra. In Elliott's case the Court of Oyer and Terminer directed an examination to be made of Elliott to "guide" it in determining the disposition which should be made of him. Section 2 of the Act of May 2, 1933 required the psychiatrist designated for this task, as a necessary qualification, to be employed by the State Department of Welfare or in a State hospital or in a mental hospital maintained by the county. It is alleged by Elliott in his petitions for *habeas corpus*, filed in the Court of Common Pleas and in the court below, and I think it is not open to doubt, that Dr. Drayton no longer possessed the necessary qualifying hospital connections at the time he was directed to make and did make the examination of Elliott. It is a possible, if not a probable, inference that Dr. Drayton who had had the necessary qualifying hospital connections prior to 1950 had severed them or had had them severed because of his advancing senility. I do not mean to imply or even to remotely suggest that the Judges of the Court of Oyer and Terminer were aware of Dr. Drayton's lack of the necessary qualifying hospital connections at the time they designated him to examine Elliott. I have no doubt had they been aware of the circumstances respecting Dr. Drayton they would have employed another and a qualified psychiatrist. But the lack of qualifications of Dr. Drayton, his own mental condition aside, cannot be regarded as a trivial matter. The Court of Oyer and Terminer, as we have cited, clearly represented to counsel that it would be guided by the psychiatrist's report.[13] Whether or not the Court became aware following Elliott's counsel's letter of July 19, 1950 addressed to it that Dr. Drayton was not quali-

13. Judge Carroll said: "What is the prognosis from your [Elliott's counsel's] reading of those abundant records? Please do not hand us any clinical report. I cannot read hospital reports. Nurses don't know how to write." and "[D]o you agree for the Court to appoint a psychiatrist and let him come in and we will rely on his report.", and again, "I would not agree to the appointment of a commission or psychiatrist by you or any District Attorney but I would only agree to the appointment of a psychiatrist by the Court, and he professionally would interpret that record and that would be the basis of the history of this man [Elliott] further that he would come into Court and translate that record into understanding terms. We would not need a lot of clinical reports. That would not be necessary for that purpose.", and again, "The hospital records must be interpreted. When there is a blemish, a spot or stain on the skin, a doctor might call it echinosis. Who knows what that is but a doctor."

Judge Smith said: "If the Court would appoint a psychiatrist, would you [Elliott's counsel] agree to turn that record over to the psychiatrist so that he could examine it? It seems to me that the psychiatrist should be able to interpret those records better than we could."

Judge Alessandroni stated: "I think the matter may resolve itself into this question at this time by stating that the Court will receive these reports and the statement made by counsel to the Court. After careful examination of such if the Court is of the mind that there is information in the reports to warrant the appointment of physicians to inquire into the mental condition of the man [Elliott] as of the time of the crime, it would make such an order. If, however, the Court is not of the opinion, that the matter presented to us does not require such action, we will then act accordingly."

The Court by Judge Alessandroni finally stated: "You may submit the record for examination by a psychiatrist and your report should reflect only what is relevant."

fied or was himself mentally incompetent does not appear. I note again that the opinion of the Court of Oyer and Terminer handed down by it on sentencing Elliott makes no direct reference to Dr. Drayton's report. But the gist of this phase of the case is that the Court of Oyer and Terminer employed a psychiatrist who was not qualified under the terms of the statute under which the Court was proceeding. No such problem was presented in the Smith case, the decision on which the court below relied as does the majority of this court.

But assuming *arguendo* that the legal qualifications of mental competency imposed on a psychiatrist engaged to guide the Court of Oyer and Terminer in the disposition of a criminal defendant, in both the Smith case and the case at bar are the same, the present writer must point out with as much vigor as he can command the great difference in the time factors. In the Smith case Dr. Drayton testified in the Court of Oyer and Terminer as to Smith's mental condition on November 5, 1948. It was alleged in the McBride affidavit filed in the Supreme Court of the United States in the Smith case, as it is in the petitions for *habeas corpus* before us in the instant case that Dr. Drayton was suffering from "some form of senile dementia" as early as 1949. The McBride affidavit alleges, as also do the petitions for *habeas corpus*, that Dr. Drayton was committed in September 1951 on a petition filed by Dr. Winifred Drayton, his wife. Dr. Drayton was in all probability mentally incapacitated when he testified in the Smith case on November 5, 1948, for, as is stated in the McBride affidavit as it is in the petitions for *habeas corpus*, Dr. Drayton's senile dementia was observable on a clinical level in January, 1951, and the condition of senile dementia is a kind of mental illness which does not develop quickly. As Mr. Justice Frankfurter said in his dissenting opinion in the Smith case, 344 U.S. at page 572, 73 S.Ct. at page 397, "Even uninformed judges may know that this kind of mental illness does not set in over night but is the culmination of a long process." But the time factors in relation to Dr. Drayton's illness and his report to the Court of Oyer and Terminer in the case at bar are appallingly exigent.

Dr. Drayton reported to the Court of Oyer and Terminer on July 6, 1950, respecting Elliott. It is alleged that he was mentally incapacitated as early as 1949 and that his condition was observable on a "clinical level" in January, 1951. His wife had him committed in September, 1951. In short, it is alleged that Dr. Drayton was called on to make a report on Elliott and Elliott's mental condition within six months of the time that his own condition of senile dementia was observable on a clinical level. Certainly due process will not suffer a psychiatrist disabled by senile dementia to advise a court respecting the disposition of a criminal defendant, at least in relation to the issue as to whether that defendant shall live or die. If Dr. Drayton was in fact suffering from senile dementia and was mentally ill at the time of his report, an issue which neither the Court of Oyer and Terminer nor the Supreme Court of Pennsylvania, nor—in my opinion—the Supreme Court of the United States, passed upon, fundamental fairness would require an examination of his mental condition by a psychiatrist who was not so disabled before the death sentence could be imposed upon Elliott. The Court of Oyer and Terminer under the circumstances alleged would have lost jurisdiction, its power to proceed. Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. Moreover, if Elliott was "insane" or mentally ill either at the time that he committed the crime or at the time of his sentence he was not legally tried or sentenced and cannot now be legally executed. The law of Pennsylvania is clear on this point. See Commonwealth ex rel. Smith v. Ashe, 1950, 364 Pa. 93, 116, 71 A.2d 107, 118. The fact that a plea of insanity has not been expressly made (albeit tacitly asserted) by Elliott's counsel on his behalf does not affect this fundamental

principle. The issue of sanity or mental illness is clearly raised by Dr. Moore's report which we have referred to previously. If Elliott was in fact insane or mentally ill the fact that he or his counsel asserted and continued to assert that he was sane and not mentally ill, as the Supreme Court of Pennsylvania states in its opinion on the *habeas corpus* proceeding, Commonwealth ex rel. Elliott v. Baldi, 373 Pa. at page 496, 96 A.2d at page 126, does not foreclose a determination that he was "insane" or mentally ill either at the time he committed the crime or at the time of his sentence for —to reiterate—if he was insane or mentally ill when he committed the crime or at the time of his trial or sentence he could not be legally tried or sentenced. Nor can he now be legally executed. The issue of Elliott's sanity or mental illness remains open if, as I believe may be the case, Dr. Drayton was suffering from senile dementia at the time of his report to the Court of Oyer and Terminer.

This court, the court below and the Supreme Court of Pennsylvania in their opinions by-pass this issue. In substance they all assert that the Drayton report can be disregarded as purely advisory. I would concede that it was not necessary in the first instance for the Court of Oyer and Terminer to make use of the Act of May 2, 1933, but having undertaken to do so I am convinced that the Court was bound to make use of a competent psychiatrist and deal with the issue of Elliott's mental condition with the psychiatrist's report as a "guide" as the statute required. Having invoked the processes of the Act of May 2, 1933 and having received the report, I am of the opinion that due process required the Court of Oyer and Terminer to make use of that report as an essential ingredient in the compounding of its judgment. To do otherwise would seem to me to constitute making a promise to the mind and to break it to the heart. But I would go further and would hold, the Act of May 2, 1933 entirely aside, that the sentencing of Elliott to death without an adequate psychiatric examination made by a mentally competent psychiatrist constituted a denial of due process of law. An adequate psychiatric examination of Elliott under the circumstances at bar was essential to due process.

The majority of this court in its thoughtful opinion seems to take the position that the Supreme Court of Pennsylvania in making use of a portion of Dr. Moore's report and inadvertently omitting therefrom Dr. Moore's references to Elliott's mental illness was seeking to reconcile medical facts with the provisions of the M'Naghten Rules, strictly adhered to in Pennsylvania, viz., the knowing of the "difference between right and wrong". I do not believe this is the fact. I think that the Supreme Court of Pennsylvania, however inadvertently, overlooked the fact that Dr. Moore had stated that Elliott was mentally ill. I do not believe the Supreme Court of Pennsylvania or the Court of Oyer and Terminer were attempting to make fine spun distinctions between Elliott being "mentally ill" and insane within the meaning of the M'Naghten Rules. I am of the view that the Supreme Court of Pennsylvania made a mistake of fact which under its own rule of law enunciated in Elliott's appeal on his *habeas corpus* proceedings, 373 Pa. at page 496, 96 A.2d at page 126, was based "upon an erroneous state of assumptions or material facts which guided or controlled" its decision as it did the sentence of the Court of Oyer and Terminer.

It has been asserted that it has not been shown, as indeed it has not been, that either the Court of Oyer and Terminer or counsel for the Commonwealth of Pennsylvania or counsel for Elliott, were aware of Dr. Drayton's alleged disqualifications at the time he rendered the report, that there was nothing deliberate or intentional on the part of the Commonwealth or the Court in the selection of a psychiatrist, Dr. Drayton, who allegedly was mentally incompetent and otherwise disqualified, and that there-

fore, by analogy to the principle enunciated in such decisions as Pyle v. Kansas, 1942, 317 U.S. 213, 63 S.Ct. 177, 87 L. Ed. 214, and United States ex rel. Almeida v. Baldi, 3 Cir., 1952, 195 F.2d 815, it cannot be successfully asserted that Elliott was denied due process. The analogy, if there be such, is a distant one. It is not always necessary that the prosecutor have deliberately acquiesced in the denial of due process of which a habeas corpus petitioner complains. Jones v. Kentucky, 6 Cir., 1938, 97 F.2d 335, 338; United States ex rel. Montgomery v. Ragen, D.C.N.D.Ill.1949, 86 F.Supp. 382, 390. Due process of law consists of all those guarantees which are "implicit in the concept of ordered liberty". Palko v. Connecticut, 1937, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288. The principle must be applied afresh in every case. Cf. Wolf v. Colorado, 1949, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782. I am of the opinion that neither the Commonwealth of Pennsylvania nor its Courts can relieve themselves of the burden of affording a defendant, such as Elliott, psychiatric examination by a mentally competent psychiatrist by simply asserting that they did not *know* that the psychiatrist employed was mentally incompetent. The Constitutional duty is to supply a mentally competent psychiatrist, not a mentally incompetent one.[14]

I am of the opinion that Elliott has been denied due process of law and that he should have the benefit of a writ of *habeas corpus* to the end that the judgment of sentence may be set aside and it may now be determined by the Court of Oyer and Terminer or any other competent tribunal of the Commonwealth of Pennsylvania whether he was "insane" or "mentally ill" at the time of the commission of the crime and at the time of his sentence. I would grant relief to this extent but to this extent only.

As to the constitutionality of the proceeding in this court and in the court below, based on Section 2241, Title 28 U.S.C., I am in entire accord with the views expressed by the majority.

I am authorized to state that Judge McLAUGHLIN and Judge STALEY join in the views expressed in this opinion.

Appendix

October 17, 1952

Barnie F. Winkelman, Esq.,
215 S. Broad Street,
Philadelphia,

Re: Theodore Elliott

Dear Sir:

(1) Graduate Temple University Medical School, pre-medical courses in University of Pennsylvania and Harvard. Post-Graduate study Cushing Clinic, Harvard Medical School, National Hospital, London, Neurological Institute, Montreal. Associate professor, neuropathology, Graduate School of Medicine, University of Pennsylvania; chief-neuropsychiatrist, Doctors Hospital, Phila., Psychosurgeon, Delaware State Hospital. Consultant, Phila. State Hospital, Wernersville State Hospital, etc. Author "Moore's Syndrome," and numerous articles.

(2) There is a strong liklihood that the head injury could have been a provocative factor in his abnormal conduct.

---

14. During the argument in this court it was suggested from the bench that to pursue the principle which has just been enunciated would be to require a psychiatric examination of every testifying psychiatrist and so on, *ad infinitum*. But aside from the fact that almost all psychiatrists are both mentally competent, and "sane" within the purview of the M'Naghten Rules, the procuring of a mentally competent and qualified psychiatrist in a city the size of Philadelphia would not have proven to be a difficult task. Certainly it would not ordinarily be necessary to employ a psychiatrist to examine a psychiatrist in order to procure a mentally competent one as a "guide" and adviser for a court. But had such a course been employed in respect to Dr. Drayton, his mental incompetence, if the allegations of the petitions for habeas corpus are true, would have been demonstrated and the Court of Oyer and Terminer, of course, would not have employed him.

It is well established that significant cerebral injury may occur without fracture of the skull. In the evidence of record there is the history of recurrent headaches and so-called fainting spells or blackouts. These are frequent *sequella* of head injuries and brain damage.

(3) After reviewing the detailed evidence in the record I must agree with the unanimous opinions rendered by the highly competent psychiatrists and neurologists to the effect that Elliott was indeed mentally deficient, a middle grade moron, both mentally defective and mentally ill. It is unfortunate that the excellent recommendations of these physicians were not followed.

(4) The descriptive phase of Dr. William Drayton, Jr.'s report and his diagnosis adequately describe defendant's mental condition with the exception of his last sentence. His report is essentially in accord with the conclusions reached by all the psychiatrists who had examined him. Dr. Drayton's final sentence: "He shows no evidence of being mentally ill," is completely erroneous, and further directly contradicts his observations and conclusions preceding it.

For these reasons, and because of the emphasis by Dr. Drayton of the probable absence of a skull fracture, and its implications, his report was misleading. It is well known that feeble-minded persons may have an innate protective shrewdness and may exhibit a pseudo-intelligence when their own ends are to be served. Moreover they are unusually suggestible and frequently indulge in criminal acts even when there is no need or real motivation for gain.

(5) His mental condition was essentially the same throughout this period. This represented a continuation of his behavior pattern as reported during his confinement in Pomeroy, Glen Mills and Huntingdon. His crimes in 1949 follow the course predicted by the psychiatrists who examined him. The mental deficiency exhibited in this man is permanent.

(6) From the data examined by me in the record and the original St. Luke's Hospital Report and the results of the examinations and opinions of many doctors over a considerable period of time, it is my considered opinion that Theodore Elliott was both mentally defective and mentally ill prior to 1950, and is still mentally ill.

Very truly yours,
/s/ Matthew T. Moore
Matthew T. Moore, M. D.
MTM:aeb